**Samuel B. SANCHEZ, Petitioner,**

v.

**Anthony HEDGPETH, Warden, Respondent.**

No. EDCV 07–01003 AG (SS).

United States District Court, C.D. California.

Feb. 28, 2010.

Samuel B. Sanchez, Soledad, CA, pro se.

James D. Dutton, Office of Attorney General of California, San Diego, CA, for Respondents.

## ORDER ADOPTING FINDINGS, CONCLUSIONS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

ANDREW J. GUILFORD, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, all of the records and files herein, and the Magistrate Judge's Report and Recommendation. The time for filing Objections to the Report and Recommendation has passed and no Objections have been received. Accordingly, the Court accepts and adopts the findings, conclusions and recommendations of the Magistrate Judge.

Accordingly, IT IS ORDERED THAT:

1. The Petition is DENIED and Judgment shall be entered dismissing this action with prejudice.

2. The Clerk shall serve copies of this Order and the Judgment herein by United States mail on Petitioner and on counsel for Respondent.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

SUZANNE H. SEGAL, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Andrew J. Guilford, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05–07 of the United States District Court for the Central District of California.

## I.

## INTRODUCTION

On August 10, 2007, Samuel B. Sanchez ("Petitioner"), a California state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus by a Person in State Custody (the "Petition") and a Memorandum of Points and Authorities in Support of the Petition (the "Pet. Memo."). On November 7, 2007, Respondent[1] filed an Answer to the Petition (the "Answer") and a Memorandum of Points and Authorities in Support of the Answer (the "Ans. Memo."). Respondent lodged eighteen documents including a two-volume copy of the Clerk's Transcript ("CT") and a two—volume copy of the Reporter's Transcript ("RT") from Petitioner's trial proceedings in the Riverside County Superior Court. On December 7, 2007, Petitioner filed a Traverse to the Answer (the "Traverse"). On December 11, 2007, Petitioner filed a Memorandum of Points and Authorities in Support of the Traverse (the "Trav. Memo."). For the reasons discussed below, it is recommended that the Petition be DENIED and that this action be DISMISSED with prejudice.

## II.

## PRIOR PROCEEDINGS

On March 10, 2004, a Riverside County Superior Court jury found Petitioner guilty of second degree robbery in violation of California Penal Code ("Penal Code") section 211 and possession of a firearm by a felon in violation of Penal Code section 12021(a)(1). (1 CT 250, 252). The jury also found true the allegation that Petitioner personally used a firearm within the meaning of Penal Code sections 12022.53(b) and 1192.7(c)(8). (1 CT 251). Two of the counts were bifurcated from the initial trial and on April 9, 2004, Petitioner pled guilty to two counts of unlawful sexual intercourse with a minor in violation of Penal Code section 261.5(c).[2] (2 CT 333–36). The trial court then imposed an indeterminate term of fifty years to life in state prison plus an additional term of twenty—one years. (2 CT 339).

On March 10, 2005, 2005 WL 555580, the California Court of Appeal affirmed the trial court's judgment. (Lodgment 8, Opinion of the California Court of Appeal ("Lodgment 8") at 1, 23). Petitioner thereafter filed a petition for review in the California Supreme Court, which was denied on June 8, 2005, "without prejudice to any relief to which [Petitioner] might be entitled [under] … *Blakely v. Washington* [, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) ]." (Lodgment 9, Petition for Review ("Lodgment 9"); Lodgment 10, California Supreme Court Order ("Lodgment 10")).

On June 23, 2006, Petitioner filed a petition for writ of habeas corpus in the Riverside County Superior Court, which was denied on August 2, 2006, without comment or citation to authority. (Lodgment 11, Petition for Writ of Habeas Corpus ("Lodgment 11"); Lodgment 12, Riverside County Superior Court Order ("Lodgment 12")). On November 2, 2006, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, which was denied on November 9, 2006, without comment or citation to authority. (Lodgment 13, Petition for Writ of Habeas Corpus ("Lodgment 13"); Lodgment 14, California Court of Appeal Order ("Lodgment 14")).

---

1. Anthony Hedgpeth, Warden of the Salinas Valley State Prison, where Petitioner is incarcerated, is substituted for his predecessor. *See* Fed.R.Civ.P. 25(d).

2. Petitioner does not assert any claims based upon his guilty plea to two counts of unlawful sexual intercourse with a minor. Accordingly, the Report does not contain any discussion of the facts surrounding Petitioner's plea.

On December 7, 2006, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which was denied on May 23, 2007, without comment or citation to authority. (Lodgment 15, Petition for Writ of Habeas Corpus ("Lodgment 15"); Lodgment 16, California Supreme Court Order ("Lodgment 16")).

On December 12, 2006, Petitioner filed a second petition for writ of habeas corpus in the California Supreme Court, which was denied on May 28, 2007, with a citation to *In re Miller,* 17 Cal.2d 734, 112 P.2d 10 (1941). (Lodgment 17, Petition for Writ of Habeas Corpus ("Lodgment 17"); Lodgment 18, California Supreme Court Order ("Lodgment 18")). The instant Petition was filed on August 10, 2007.

## III.

### FACTUAL BACKGROUND

The following facts, taken from the California Court of Appeal's unpublished decision, have not been rebutted with clear and convincing evidence and must, therefore, be presumed correct. 28 U.S.C. § 2254(e)(1).

On December 9, 2002, employees of the Kirby vacuum cleaner company were demonstrating and selling carpet—cleaning equipment door to door in a residential area of Moreno Valley. There were five or six employees participating, supervised by David Schmidt, the manager. One of the employees, Lauren Sanchez, also was Schmidt's girlfriend. (Sanchez was not related to [Petitioner].)

Near the end of the day, Schmidt and Sanchez drove in the company van to a restaurant to get something to eat. While at the restaurant, they received several phone calls from their office manager telling them that they needed to go pick up Kirby employee Audrey Williams from one of the houses on the route, where she had been demonstrat-ing equipment. Schmidt and Sanchez left the restaurant and drove to the house. Williams came out of the house, and she and Schmidt starting putting the equipment in the van.

While they were loading the equipment, Lajamara Jenkins came out of the house and starting [sic] yelling at Schmidt. Jenkins was upset that he had not come promptly to pick up Williams. It was 8:30 to 9:00 p.m. by this time.

Jenkins asked Schmidt how much money he had. Schmidt asked, "What, are you trying to rob me or what?" [Petitioner], who had come out of the house in the meantime, came around the van and stood on one side of Schmidt while Jenkins stood on the other. [Petitioner] asked Schmidt again how much money he had.

Schmidt kind of smirked and asked [Petitioner] if he was trying to rob him. [Petitioner] pulled a gun and held it to Schmidt's temple. Jenkins asked Schmidt to open his wallet. [Petitioner] told Schmidt to do as Jenkins said.

Schmidt opened his wallet and let Jenkins take his money. As [Petitioner] and Jenkins left the scene, [Petitioner] yelled something like, "Don't be doing this in my hood."

Schmidt, Sanchez, and Williams left in the van to go pick up the other Kirby employees. Sanchez called 911 on her cell phone and reported the incident.

On December 11, 2002, police found [Petitioner] and Jenkins inside the house at the address at which the robbery had occurred. They also found a gun in the backyard that resembled the one described by the eyewitnesses to the robbery.

(Lodgment 8 at 2–3).

## IV.

## PETITIONER'S CLAIMS [3]

In the Petition, Petitioner raises five grounds for federal habeas relief. First, Petitioner contends that his trial counsel rendered ineffective assistance by failing to: (A) "challenge the tainted in court identification"; (B) raise the issue "that Petitioner's *Miranda* rights were violated"; (C) "make an adequate and timely proffer of alleged victim's bad act—priors to impeach his veracity"; (D) "request limited jury instruction[s]"; (E) "object during trial to evidence that was suppressed"; and (F) demonstrate "that alleged witness participated to [sic] this alleged robbery." (Petition at 5) (emphasis added). Second, Petitioner contends that the trial court violated his constitutional right to self-representation because: (A) "discovery motions were not fully honored"; (B) the trial court "failed to admonish the district attorney for malfeasance/misconduct"; and (C) the trial court "denied Petitioner the compulsory process for obtaining a defense witness in his favor." (*Id.*). Third, Petitioner contends that his sentence violates a 1991 plea agreement. (*See id.* at 6). Fourth, Petitioner contends that his appellate counsel rendered ineffective assistance by failing to raise Grounds 1, 2, and 3 on appeal. (*See id.*). Fifth, Petitioner contends that the trial court violated his constitutional rights by: (A) excluding evidence of the victim's prior bad acts; (B) failing to sua sponte give the jury a limiting instruction regarding Petitioner's prior conviction; and (C) imposing consecutive sentences based on facts not found by the jury beyond a reasonable doubt. (*See id.*).

## V.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which effected amendments to the federal habeas statutes, applies to the instant Petition because Petitioner filed it after AEDPA's effective date of April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Under AEDPA, a federal court may grant habeas relief if a state court adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) and (2).

"[A] decision by a state court is 'contrary to' [the] clearly established law [of the Supreme Court] if it *'applies a rule that contradicts the governing law set forth in [Supreme Court] cases.'*" *Frantz v. Hazey*, 533 F.3d 724, 734 (9th Cir.2008) (quoting *Price v. Vincent*, 538 U.S. 634, 640, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003)). It is also "contrary to" clearly established Supreme Court case law "if it applie[s] the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result." *Bruce*

---

**3.** In connection with his claims, Petitioner requests an evidentiary hearing. (*See* Trav. Memo. at 10–11). However, because the Court finds the current record sufficient to resolve Petitioner's claims, an evidentiary hearing is unnecessary. *See Campbell v. Wood,* 18 F.3d 662, 679 (9th Cir.1994) ("An evidentiary hearing is not required on allegations that are conclusory and wholly devoid of specifics. Nor is an evidentiary hearing required on issues that can be resolved by reference to the state court record." (internal quotation marks and citation omitted)).

*v. Terhune,* 376 F.3d 950, 953 (9th Cir. 2004) (citing *Williams v. Taylor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). "A decision involves an 'unreasonable application' of federal law if 'the state court identifies the correct governing legal principle ... but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams,* 529 U.S. at 413, 120 S.Ct. 1495).

■■■ Pursuant to AEDPA's "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state—court decision applied [Supreme Court precedent] incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied [Supreme Court precedent] to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti,* 537 U.S. 19, 24–25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam) (citations omitted). This standard requires more than a finding that the state court committed "clear error." *Lockyer v. Andrade,* 538 U.S. 63, 75–76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). Instead, the reviewing court must find that the application of federal law was "objectively unreasonable" in order to warrant habeas relief. *Id.* at 76, 123 S.Ct. 1166. The Supreme Court has characterized AEDPA's standard of review as a "highly deferential standard for evaluating state-court rulings," *Lindh,* 521 U.S. at 333 n. 7, 117 S.Ct. 2059, and has opined that this standard "demands that state court decisions be given the benefit of the doubt." *Woodford,* 537 U.S. at 24, 123 S.Ct. 357.

■■■ AEDPA limits the scope of clearly established federal law to the holdings of the United States Supreme Court as of the time of the state court decision under review. *Andrade,* 538 U.S. at 71, 123 S.Ct. 1166 (citing *Williams,* 529 U.S. at 412, 120 S.Ct. 1495). The applicable state court decision here is the California Court of Appeal's opinion. (*See* Lodgment 8). The California Supreme Court denied Petitioner's petition for review "without prejudice to any relief to which [Petitioner] might be entitled [under] ... *Blakely v. Washington* [, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004)]." (Lodgment 10). In these circumstances, a district court "looks through" the California Supreme Court decision to the last reasoned decision as the basis for the state court's judgment. *Shackleford v. Hubbard,* 234 F.3d 1072, 1079 n. 2 (9th Cir.2000) (citing *Ylst v. Nunnemaker,* 501 U.S. 797, 803–04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)). To the extent that Petitioner's federal habeas claims were not addressed in any reasoned state court decision, however, this Court conducts an independent review of the record. *See Himes v. Thompson,* 336 F.3d 848, 853 (9th Cir.2003) ("Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."); *accord Pirtle v. Morgan,* 313 F.3d 1160, 1167 (9th Cir. 2002).

## VI.

## DISCUSSION [4]

**A. *Petitioner Is Not Entitled To Habeas Relief On His Instructional Error Claim***

In Ground 5B, Petitioner contends that the trial court violated his constitutional rights by failing to sua sponte give the

---

4. The Court will address Petitioner's claims in a different order than presented in the Peti-

tion.

jury a limiting instruction regarding Petitioner's prior conviction. (*See* Petition at 6). Specifically, Petitioner argues that the *"where a prior is stipulated* [,] the trial court must limit the jurors' use of that prior sua sponte."* (Pet. Memo., Exh. 8 at 20). There is no merit to this claim.

■■■ Instructional error constitutes a violation of the Constitution only where the error by itself so infected the entire trial that the resulting conviction violates due process. *See Waddington v. Sarausad,* — U.S. —, 129 S.Ct. 823, 832, 172 L.Ed.2d 532 (2009); *Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Turner v. Calderon,* 281 F.3d 851, 865–66 (9th Cir.2002). Where the alleged error is the failure to give an instruction, the burden on the petitioner is "especially heavy." *Henderson v. Kibbe,* 431 U.S. 145, 155, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) ("An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."); *accord Clark v. Brown,* 450 F.3d 898, 904 (9th Cir. *as amended* May 30, 2006); *Murtishaw v. Woodford,* 255 F.3d 926, 971 (9th Cir.2001); *Villafuerte v. Stewart,* 111 F.3d 616, 624 (9th Cir.1997). "The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given." *Henderson,* 431 U.S. at 156, 97 S.Ct. 1730; *accord Murtishaw,* 255 F.3d at 971.

■■■ Even if an error occurred in instructing the jury, habeas relief will be granted only if the petitioner can establish that the error had a substantial and injurious effect or influence in determining the jury's verdict. *Hedgpeth v. Pulido,* — U.S. —, 129 S.Ct. 530, 532, 172 L.Ed.2d 388 (2008) (per curiam); *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *accord Clark,* 450 F.3d at 905.

Here, the California Court of Appeal rejected Ground 5B as follows:

Count 3 charged that [Petitioner] violated Penal Code section 12021, subdivision (a)(1), which provides that any person who has been convicted of a felony and who possesses or controls a firearm is guilty of a felony. [Petitioner] stipulated for purposes of count 3 that he had received a felony conviction in May 1998.

The prosecutor read the stipulation to the jury. At the end of the case, the court instructed the jury they must accept as true the existence of the prior conviction for purposes of count 3.

[Petitioner] contends the court's failure to instruct the jury specifically to consider the prior conviction only for the purpose for which it was admitted—to establish the element of his status as a felon—violated the federal Constitution. [Petitioner] did not request such a limiting instruction but contends the court was obligated to give one sua sponte.

Evidence Code section 355 provides: "When evidence is admissible ... for one purpose and is inadmissible ... for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." ([Emphasis] added.) Consistent with section 355, numerous decisions of the California Supreme Court have established that "a trial court generally has no sua sponte duty to give an instruction limiting the purpose for which evidence is received ...." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 84 [17 Cal.Rptr.3d 710, 96 P.3d 30]; accord, *People v. Horning* (2004) 34 Cal.4th 871, 909 [22 Cal.Rptr.3d 305, 102 P.3d 228]; *People v. Carter* (2003) 30 Cal.4th 1166, 1197–1198 [135 Cal.Rptr.2d 553, 70 P.3d 981]; *People v. Jones* (2003) 30 Cal.4th 1084, 1116 [135 Cal.Rptr.2d 370, 70 P.3d 359].)

In *People v. Hernandez* (2004), 33 Cal.4th 1040 [16 Cal.Rptr.3d 880, 94 P.3d 1080], for example, the defendants contended the court should have instructed the jury on the limited use it could make of gang evidence. Rejecting the contention, the Supreme Court stated that "although a court should give a limiting instruction on request, it has no sua sponte duty to give one. [Citations.]" (*Id.* at p. 1051 [16 Cal.Rptr.3d 880, 94 P.3d 1080].)

[Petitioner] notes that in *People v. Valentine* (1986) 42 Cal.3d 170 [228 Cal. Rptr. 25, 720 P.2d 913], the Supreme Court stated in dicta that if a prior conviction is admitted solely to establish ex-felon status for purposes of Penal Code section 12021, the trial court should give a limiting instruction "at defendant's request . . . ." (*Valentine*, at p. 182, fn. 7 [228 Cal.Rptr. 25, 720 P.2d 913].) [Petitioner] then asserts that had the Supreme Court squarely considered the issue, it would have found a limiting instruction is constitutionally *required* in that situation, even *without* a request. [Petitioner's] assertion is simply inconsistent with the Supreme Court's decisions in the *Coffman, Horning, Carter, Jones,* and *Hernandez* cases cited, *ante.*

In addition, [Petitioner] does not address *People v. Griggs* (2003) 110 Cal. App.4th 1137 [2 Cal.Rptr.3d 380] (*Griggs* ), in which the court resolved the precise issue now before this court and rejected the position [Petitioner] advocates. The court held that where a defendant stipulates to a prior felony conviction offered to prove his felon status for purposes of Penal Code section 12021, subdivision (a)(1), the trial court's failure to give a sua sponte limiting instruction does *not* violate due process. (*Id.* at pp. 1138–1139 [2 Cal.Rptr.3d 380].) In reaching that conclusion, the court considered and rejected the arguments [Petitioner] proposes in support of his position.

One of those arguments is that Evidence Code section 355 does not apply in this case, because the statute deals with the admissibility of "evidence," while here the prior conviction was proved through a stipulation, not through the introduction of evidence. The *Griggs* court said in rejecting that argument: "We fail to see how a sanitized stipulation can create greater prejudice to a defendant than if the prosecution was able to present evidence, in the form of testimony or documents, of the number and nature of the defendant's prior convictions—a situation where there is no sua sponte duty to give a limiting instruction." (*Griggs, supra,* 110 Cal. App.4th 1137, 1141 [2 Cal.Rptr.3d 380].) We agree with *Griggs'* s reasoning and conclusion on this point.

The *Griggs* court similarly rejected the argument, asserted by [Petitioner] in this case, that since jurors are told they must accept stipulated facts as conclusively proved, without a limiting instruction there is too great a risk they will consider prior misconduct as an indicator of criminal propensity, rather than for the limited purpose for which it is admissible. The *Griggs* court stated: " '[E]vidence of past offenses may not improperly affect the jury's deliberation if . . . the evidence is obviously used to effect one or more of the many legitimate purposes for which it can be introduced.' [Citation.] Where a stipulation in [sic] entered into for the purpose of proving a prior felony conviction, the fact of that conviction is 'obviously used' to effect a legitimate purpose—in this case, to prove an element of the offenses of being a felon in possession of a firearm and ammunition." (*Griggs, supra,* 110 Cal.App.4th 1137, 1142 [2 Cal. Rptr.3d 380].)

Here, it was made abundantly clear to the jury that [Petitioner's] prior felony conviction was admitted only for the purpose of establishing his status as a felon, as an element of count 3. The stipulation, as read to the jury, stated: "Both the People and the defense stipulate that [Petitioner] received a felony conviction on May 20th, 1998, *for purposes of Count 3* of the amended information." ( [Emphasis] added.)

[Petitioner] complains the court in its subsequent instructions emphasized that the jurors "must accept as true the existence of [Petitioner's] previous felony conviction." He omits the context of that admonition. In full, the court instructed:

"Every person who, having previously been convicted of a felony, owns or has in his possession or under his custody or control any pistol, revolver, or other firearm, is guilty of a violation of section 12021, subdivision (a), subsection (1) of the Penal Code, a crime.["]

"In this case the previous felony conviction has already been established by stipulation so that no further proof of that fact is required. You must accept as true the existence of this previous felony conviction."

Again, the quoted language demonstrates it was made abundantly clear that the jury was to accept the conviction as proven *for the purpose of the Penal Code section 12021, subdivision(a)(1) charge.*

No other instruction the court gave suggested in any way that the prior conviction could be used for any purpose other than to establish the status element of count 3. The court merely gave a general instruction stating: "Statements made by the attorneys during the trial are not evidence. However, if the attorneys have stipulated or agreed to a fact, you must regard that fact as proven." There is no reasonable possibility

the jurors interpreted that instruction, as [Petitioner] speculates, to mean, "you must regard that fact as proven *and* you may consider it in determining [Petitioner's] guilt of any of the crimes charged."

The Supreme Court has recognized a "possible exception" to the rule that no sua sponte limiting instruction is required where evidence is admitted for a limited purpose. However, the court has made clear that if such an exception applies at all, it applies only "in 'an occasional extraordinary case in which unprotested evidence ... is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose.' [Citation.]" (*People v. Hernandez, supra,* 33 Cal.4th 1040, 1051–1052 [16 Cal.Rptr.3d 880, 94 P.3d 1080].)

The possible exception could not apply here. The prior conviction was not a dominant part of the evidence against [Petitioner]. Most of the evidence consisted of the three eyewitnesses' accounts of the robbery. The stipulation that [Petitioner] had received a felony conviction was not highly prejudicial, since the jurors were not told what felony [Petitioner] had been convicted of or any facts of the offense. The evidence was not "minimally" relevant to a legitimate purpose, because it was the only proof offered on one of the elements of one of the charged offenses. We therefore conclude no sua sponte limiting instruction was required.

(Lodgment 8 at 14–19).

 Under California law, a trial court generally has "no duty to instruct *sua sponte* on the limited admissibility of evidence of past criminal conduct." *People v. Griggs,* 110 Cal.App.4th 1137, 1139, 2 Cal.Rptr.3d 380 (2003). The Ninth Circuit has similarly held that trial courts have no *sua sponte* duty to give a limiting instruc-

tion regarding the admission of evidence of "other criminal acts." *United States v. Multi—Management, Inc.*, 743 F.2d 1359, 1364 (9th Cir.1984) ("It is well—settled that where no limiting instruction is requested concerning evidence of other criminal acts, the failure of the trial court to give such an instruction *sua sponte* is not reversible error."). Petitioner argues that "[t]here remains a 'reasonable likelihood' that the court's instructions were interpreted so as to permit consideration of [Petitioner's] prior felony conviction in finding him guilty." (Pet. Memo., Exh. 8 at 26). However, the parties' stipulation clearly explained that Petitioner's prior felony conviction was being admitted "for purposes of Count 3 of the amended Information." (*See* 2 RT 273) ("Both the People and the defense stipulate that [Petitioner] received a felony conviction on May 20th, 1998, for purposes of County 3 of the amended Information.").

Moreover, the trial court's subsequent instructions also informed the jury that Petitioner's prior felony conviction had been admitted for purposes of Count 3:

> [Petitioner] is accused in Count 3 of having violated section 12021, subdivision (a), subsection (1), a crime.
>
> Every person who, having personally been convicted of a felony, owns or has in his possession or under his custody or control any pistol, revolver, or other firearm, is guilty of a violation of section 12021, subdivision (a), subsection (1) of the Penal Code, a crime.
>
> In this case the previous felony conviction has already been established by stipulation so that no further proof of that fact is required. You must accept as true the existence of this previous felony conviction.
>
> In order to prove this crime, each of the following elements must be proved: One, [Petitioner] owned or had in his possession or had under his control a

handgun, and, two, [Petitioner] had knowledge of the presence of the handgun.

(2 RT 433–34; 1 CT 212). Indeed, as noted by the court of appeal, "[n]o other instruction the court gave suggested in any way that the prior conviction could be used for any purpose other than to establish the status element of count 3." (Lodgment 8 at 18).

Thus, Petitioner has failed to meet his especially heavy burden of showing that the trial court's choice of jury instructions "by itself so infected the entire trial that the resulting conviction violates due process." *McGuire*, 502 U.S. at 72, 112 S.Ct. 475 (internal quotation marks omitted). Indeed, the Ninth Circuit has held that the admission of propensity evidence does not violate clearly established federal law. *See Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir.2008), *cert. denied*, —— U.S. ——, 129 S.Ct. 941, 173 L.Ed.2d 141 (2009); *see also Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir.2009) ("The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.").

██ Even assuming that the trial court should have given a limiting instruction *sua sponte*, Petitioner cannot show prejudice because the evidence of his guilt was overwhelming. *See Waddington*, 129 S.Ct. at 833 (holding that it was not objectively unreasonable for the state courts to conclude that the instructional error was harmless because of the overwhelming evidence); *see also Allen v. Woodford*, 395 F.3d 979, 992 (9th Cir. *as amended* Jan. 24, 2005) ("[T]o the extent that any claim of error … might be meritorious, we would reject that error as harmless because the evidence of [the petitioner's] guilt is overwhelming."). Indeed, David Pineda Schmidt ("Schmidt") testified that Petitioner held a gun to Schmidt's right

temple and demanded Schmidt's money. (*See* 2 RT 328, 343–44). Lauren Sanchez ("Sanchez") and Audrey Williams also testified that Petitioner held a gun against Schmidt's right temple and demanded Schmidt's money. (*See* 2 RT 216, 230, 274, 284, 286–87). Thus, the Court concludes that the state courts' denial of this claim was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

### B. *Petitioner Is Not Entitled To Habeas Relief On His Self–Representation Claims*

In Ground 2, Petitioner contends that the trial court violated his constitutional right to self-representation because: (A) "discovery motions were not fully honored"; (B) the trial court "failed to admonish the district attorney for malfeasance/misconduct"; and (C) the trial court "denied Petitioner the compulsory process for obtaining a defense witness in his favor." (Petition at 5). There is no merit to these claims.

 Under the Sixth Amendment, a criminal defendant has the right to waive his right to counsel and represent himself. *See Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *see also Indiana v. Edwards*, 554 U.S. 164, 128 S.Ct. 2379, 2383, 171 L.Ed.2d 345 (2008); *Robinson v. Kramer*, 588 F.3d 1212, 1216 (9th Cir.2009). Unlike the Sixth Amendment right to counsel, the right to self—representation does not attach until asserted. *See Sandoval v. Calderon*, 241 F.3d 765, 774 (9th Cir.2000). Invocation of the right must be unequivocal, timely, and not a tactic to secure delay. *See Stenson v. Lambert*, 504 F.3d 873, 882

(9th Cir.2007), *cert. denied sub nom., Stenson v. Uttecht*, —— U.S. ——, 129 S.Ct. 247, 172 L.Ed.2d 188 (2008); *Hirschfield v. Payne*, 420 F.3d 922, 926 (9th Cir.2005).

 However, "the right of self—representation is not absolute." *Edwards*, 128 S.Ct. at 2384; *accord Martinez v. Court of Appeal*, 528 U.S. 152, 161, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000); *see also Faretta*, 422 U.S. at 834 n. 46, 95 S.Ct. 2525 ("The right of self—representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law."); *Cooks v. Newland*, 395 F.3d 1077, 1080 (9th Cir.2005). A defendant's right to self—representation is contingent on his being "able and willing to abide by rules of procedure and courtroom protocol." *McKaskle v. Wiggins*, 465 U.S. 168, 173, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); *see also Kulas v. Flores*, 255 F.3d 780, 786 (9th Cir.2001) ("Since the trial judge bears the responsibility for maintaining order and the appellate court is limited to reviewing a cold record, we give substantial deference to the trial judge's decisions about courtroom management. This is true even where the defendant is pro se."). Thus, a "trial judge may terminate self—representation by a defendant who deliberately engages in serious and obstructionist misconduct." *Faretta*, 422 U.S. at 834 n. 46, 95 S.Ct. 2525; *see also Martinez*, 528 U.S. at 162, 120 S.Ct. 684 ("Even at the trial level, therefore, the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.").

As there is no reasoned state court decision addressing Ground 2, this Court conducts an independent review of the record. *See Pirtle*, 313 F.3d at 1167. On June 23, 2003, Petitioner was scheduled to appear before the Honorable Robert G. Spitzer

("Judge Spitzer") for the start of trial, (*see* 1 CT 94–95), but did not appear because he was placed on suicide watch at the jail. (*See* 1 CT 102; 1 RT 77–78). Petitioner's trial counsel suggested that Petitioner undergo a mental health evaluation pursuant to Penal Code section 1368 (competency to stand trial). (*See* 1 CT 102; 1 RT 94–95). Judge Spitzer ordered Petitioner to undergo a mental health evaluation and continued the matter until June 26, 2003. (*See* 1 CT 102–03, 107; 1 RT 104). On June 26, 2003, Judge Spitzer again continued the matter until July 11, 2003. (*See* 1 CT 104; 1 RT 119).

On July 11, 2003, Judge Spitzer reviewed a mental health report prepared by Dr. Harvey Oshrin ("Dr. Oshrin") and determined that Petitioner was competent to stand trial. (*See* 1 CT 106). Dr. Oshrin's report and the transcript of the hearing do not appear in the record because Judge Spitzer ordered them sealed. (*See* 1 CT 106; 1 RT 122–41). At a subsequent hearing, however, the prosecutor commented that Dr. Oshrin "diagnosed [Petitioner] with malingering" and concluded that he "would try to do anything he could to avoid going to trial." (1 RT 179). A different judge, the Honorable J. Thompson Hanks ("Judge Hanks"), eventually set Petitioner's trial for August 25, 2003, (*see* 1 CT 110), but the trial was continued to September 10, 2003, because of defense counsel's unavailability. (*See* 1 CT 111–13).

On September 10, 2003, Petitioner appeared before the Honorable Patrick F. Magers ("Judge Magers") and requested to represent himself. (*See* 1 CT 114; 1 RT 142). Petitioner initialed and signed a Petition to Proceed in Propria Persona which stated that he understood his right to be represented by a lawyer; understood that the trial court recommended that he not represent himself; understood that he would have to follow technical rules of substantive law, criminal procedure, and

evidence; understood that the People's case would be handled by an experienced prosecutor; understood that he would have to conduct his own trial; and understood that he was waiving any claim based on ineffective assistance of counsel. (*See* 1 CT 115). Judge Magers then explained to Petitioner his maximum possible sentence, advised Petitioner not to represent himself, and warned Petitioner that the trial court would not provide any special attention or assistance. (*See* 1 RT 144–45). When asked how long he needed to prepare for trial, Petitioner stated that he needed "[a]t least two months." (1 RT 147). Judge Magers responded that he would permit Petitioner to have "about thirty days with no further continuances." (1 RT 148). Petitioner then accepted the trial court's terms. (*See id.* ("I'll trail for thirty days, then.")). Finally, Judge Magers granted Petitioner's request to represent himself and continued the trial until October 14, 2003. (*See* 1 CT 114; 1 RT 149).

On October 8, 2003, Petitioner requested a thirty day continuance so that his investigator could interview potential witnesses. (*See* 1 CT 123–27; 1 RT 170). The Honorable Edward D. Webster ("Judge Webster") granted Petitioner's request and continued the trial until November 12, 2003. (*See* 1 CT 121; 1 RT 170). On November 12, 2003, Petitioner requested an additional sixty day continuance because his investigator had not been able to locate certain witnesses. (*See* 1 CT 129–32). Judge Webster held a hearing to consider Petitioner's request, but Petitioner asked Judge Webster to continue the hearing. (*See* 1 CT 128). Judge Webster then continued the hearing until November 14, 2003. (*See id.*). On November 14, 2003, Judge Webster granted Petitioner's request and continued the trial until December 4, 2003. (*See* 1 CT 139).

On December 4, 2003, Petitioner requested that Judge Webster appoint an attorney to represent him. (*See* 1 CT 143–46). Judge Webster held a hearing to consider Petitioner's request, but Petitioner asked Judge Webster to continue the hearing. (*See* 1 CT 140). Judge Webster then continued the hearing until December 5, 2003. (*See id.*). On December 5, 2003, Judge Webster explained to Petitioner that "generally speaking, when you make a choice to represent yourself, you have no right night [sic] to have an attorney re—appointed to represent you." (1 RT 173). Petitioner replied, "I have no other things to say. I'm not going to represent myself anymore." (*Id.*). Judge Webster then asked the public defender when he could be ready to represent Petitioner at trial. (*See id.*). The public defender stated that he could be ready by January 15 or 16, 2004. (*See id.*). Finally, Judge Webster denied Petitioner's request as follows:

In light of the public defender being unavailable until January and [Petitioner's] attitude toward this process, it seems to me he made a choice to represent himself and he should stay with that choice, and I don't think it's appropriate to delay the case given that the crime occurred on December 9th of 2002. And I think in my view his attitude and refusal to even discuss this issue suggest he's trying [to] manipulate the process. We don't have to put up with it. [¶] We'll see you on December 15th for trial.

(1 RT 173).

On December 8, 2003, Petitioner reasserted his desire for an attorney before Judge Magers. (*See* 1 CT 147; 1 RT 176). Petitioner explained as follows: "I got a little over my head and stuff, and I'm—my medication is kind of affecting my health, my mental health issues, just want to back up out of pro per." (1 RT 177). Over the prosecutor's objection, Judge Magers granted Petitioner's request as follows:

At this time, . . . I'm going to exercise my discretion, and, as I indicated, I like these cases tried only once, and I don't want this case tried again two years from now . . . .

At this time, the Public Defender is appointed. It appears there's no prejudice to the People in a five—week delay. But, [Petitioner], I'm going to tell you this, if I reappoint the Public Defender, you will not be representing yourself.

(1 RT 180). Petitioner stated that he understood. (*See id.*). Judge Magers then engaged in the following colloquy with Petitioner:

THE COURT: You understand that?

THE [PETITIONER]: I understand that.

THE COURT: If I appoint the Public Defender, that's a final deal.

THE [PETITIONER]: Yes, that's it.

THE COURT: That's it.

Do you understand?

THE [PETITIONER]: Yes.

(*Id.*). Judge Magers continued the trial until January 20, 2004. (*See* 1 CT 147; 1 RT 181).

On January 9, 2004, the prosecutor requested that the Public Defender's Office be relieved from representing Petitioner. (*See* 1 CT 148). Judge Webster then continued the hearing on the prosecutor's request until January 12, 2004. (*See id.*). On January 12, 2004, the prosecutor argued that appointing a public defender to represent Petitioner would cause further delays of a trial that had already been repeatedly delayed. (See 1 RT 183–84). After considering the prosecutor's arguments, Judge Webster denied the request as follows:

I agree. There are many things about this case that make it desirable to get out to trial, not the least of which is the age, not the least of which is the fact

that [Petitioner], apparently, refused to come to court. There was a 1366[sic] hearing which showed that he may be malingering.

The fact that he went pro per and now wants to have an attorney, all of are common tactics by a sophisticated defendant to delay a trial. And I think a reasonable person would perceive that's what's going on here. And it's offensive, and I agree it's offensive, and I think you can make a compelling argument that's what's occurring here.

But having said all that, he now has an attorney appointed by Judge Magers, not by myself. It's a reasonable choice by Judge Magers, under the circumstances, because Judge Magers was worried what happens when [Petitioner] doesn't come down to court and you're faced with a trial where he's absented himself voluntarily, which is conduct consistent with what we've seen before.

If you have a lawyer, you can go ahead and proceed. But there's no one there to stand in for the person. It creates an additional problem for the Appellate Court and the appellate record. So, I mean, we all know there are many ways to manipulate the system. And it's frustrating that we can't do much about some of these, but, essentially, once a person's developed a track record, we're in a much better position to deal with it in the future.

And I think [Petitioner] has reached that point. I think unless he can show compelling proof that [the public defender] is not doing the job, he's not going to get a new lawyer. He wants to represent himself, he'll probably be unsuccessful, because he's already tried that once. So I think he's going to finally have to come to trial.

(1 RT 186–87).

On January 20, 2004, Petitioner's public defender requested a continuance and Judge Webster continued the trial until February 17, 2004. (*See* 1 CT 150). On February 17, 2004, Judge Webster assigned the trial to the Honorable Timothy J. Heaslet ("Judge Heaslet") and the trial trailed to February 19, 2004. (*See* 1 CT 151).

On February 19, 2004, Petitioner requested the appointment of a different attorney and Judge Heaslet scheduled a hearing on Petitioner's request for February 20, 2004. (*See* 1 CT 152). On February 20, 2004, Petitioner withdrew his request and the trial was trailed to February 26, 2004. (*See* 1 CT 153–54). On February 26, 2004, the trial was trailed to March 1, 2004. (*See* 1 CT 155). On March 1, 2004, the trial was trailed to March 2, 2004. (*See* 1 CT 156). On March 2, 2004, the trial was trailed to March 3, 2004. (*See* 1 CT 157). On March 3, 2004, the trial commenced with Petitioner represented by a public defender. (*See* 1 CT 159).

■ Having independently reviewed the record, it is abundantly clear that the state court did not violate Petitioner's right to self-representation. Indeed, the record powerfully demonstrates that all of the superior court judges assigned to Petitioner's case made great efforts to protect Petitioner's rights by granting numerous continuances and ultimately granting all of Petitioner's requests regarding his representation. On September 10, 2003, Judge Magers granted Petitioner's request to represent himself. (*See* 1 CT 114; 1 RT 149). While Judge Webster denied Petitioner's request to appoint counsel on December 5, 2003, (*see* 1 RT 173), Judge Magers subsequently granted Petitioner's request on December 8, 2003. (*See* 1 CT 147; 1 RT 181). Finally, Petitioner initially requested the appointment of a different attorney on February 19, 2004, (*see* 1 CT 152), but later withdrew his request on February 20, 2004. (*See* 1 CT 154).

■ Petitioner asserts that Judge Webster "treated him unfairly and failed to conduct the pre-trial court proceedings impartially." (Pet. Memo. at 19). However, as set forth above, Judge Webster granted Petitioner's request to continue the trial on October 8, 2003, (see 1 CT 121; 1 RT 170), Petitioner's request to continue the hearing on November 12, 2003, (see 1 CT 128), Petitioner's request to continue the trial on November 14, 2003, (see 1 CT 139), and Petitioner's request to continue the trial on January 20, 2004. (See 1 CT 150). The only request that Judge Webster denied was Petitioner's request to reappoint counsel on December 5, 2003. (See 1 RT 173). However, defendants are not entitled to have counsel reappointed after requesting to represent themselves. See, e.g., Menefield v. Borg, 881 F.2d 696, 700 (9th Cir.1989) ("There are times when the criminal justice system would be poorly served by allowing the defendant to reverse his course at the last minute and insist upon representation by counsel. When, for example, for purposes of delay, criminal defendants have sought continuances on the eve of trial, we have refused to disrupt the proceedings to accommodate their wishes." (citations omitted)).

■ Moreover, Judge Webster made a factual finding that Petitioner was intentionally trying to delay his trial. (See 1 RT 186) ("The fact that he went pro per and now wants to have an attorney, all of [which] are common tactics by a sophisticated defendant to delay a trial. And I think a reasonable person would perceive that's what's going on here. And it's offensive, and I agree it's offensive, and I think you can make a compelling argument that's what's occurring here."); see also Avila v. Roe, 298 F.3d 750, 753 (9th Cir. 2002) (explaining that trial courts may deny a Faretta request if "it is shown to be a tactic to secure delay" (internal quotation marks omitted)). Judge Webster's factual finding is entitled to a presumption of cor-

rectness on habeas review, see 28 U.S.C. § 2254(e)(1), and Petitioner "has the burden of rebutting this presumption by clear and convincing evidence." Sophanthavong v. Palmateer, 378 F.3d 859, 866 (9th Cir., as amended Aug. 3, 2004).

■ To the extent Petitioner claims that Judge Webster was biased against him, Petitioner's claim fails because he cannot "overcome [the] presumption of honesty and integrity in those serving as adjudicators." Withrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); see also Ortiz v. Stewart, 149 F.3d 923, 938 (9th Cir.1998) ("[W]e abide by the general presumption that judges are unbiased and honest."). Indeed, the Supreme Court has held that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." Liteky v. United States, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994); see also id. at 556, 114 S.Ct. 1147 ("A judge's ordinary efforts at courtroom administration—even a stern and short—tempered judge's ordinary efforts at courtroom administration—remain immune."); accord Ortiz, 149 F.3d at 940. Here, Petitioner's claims are essentially complaints about Judge Webster's judicial rulings and his efforts at courtroom administration. (See Pet. Memo. at 18–28).

In short, the Court concludes that the state courts' denial of this claim was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 1. Ground 2A

■ In Ground 2A, Petitioner contends that the trial court violated his constitu-

tional right to self-representation because "discovery motions were not fully honored." (Petition at 5). Specifically, Petitioner argues that he filed two discovery motions pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which the trial court did not adequately address. (*See* Pet. Memo. at 19–21). In *Brady,* the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194; *accord Schad v. Ryan,* 595 F.3d 907, 914–15 (9th Cir.2010); *Edwards v. Ayers,* 542 F.3d 759, 768 (9th Cir.2008). Impeachment evidence as well as exculpatory evidence falls within the *Brady* rule. *See United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Additionally, "[t]he Supreme Court has clearly held that *Brady* suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor." *United States v. Price,* 566 F.3d 900, 908 (9th Cir.2009) (citing *Youngblood v. West Virginia,* 547 U.S. 867, 869–70, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006) (per curiam)) (internal quotation marks omitted).

■■■■■■ Evidence is material under *Brady* only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (internal quotation marks omitted); *accord Edwards,* 542 F.3d at 768. A reasonable probability is one that "undermines confidence in the outcome of the trial." *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375. In sum, "[t]here are three components of a true *Brady* viola-

tion: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either wilfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

■■■ Here, the trial court held a hearing to consider Petitioner's first *Brady* discovery motion on September 25, 2003.[5] (*See* 1 CT 116; 1 RT 149—A). The trial court asked the prosecutor if he had any objection to the motion and pointed out that the prosecution had "an independent constitutional obligation anyway." (1 RT 149–A). The prosecutor stated that he did not object and the trial court granted the motion. (*See id.*). The trial court then scheduled a follow-up hearing for the next day and directed the prosecutor to bring his case file so that Petitioner could obtain any discovery he was missing. (*See* 1 RT 151). The prosecutor agreed to bring his file and provide Petitioner any discovery he did not have. (*See id.*). The record does not contain a transcript of the hearing on September 26, 2003, but it does show that the trial court ordered the prosecutor's investigator to provide reports to Petitioner. (*See* 1 CT 117).

On November 12, 2003, Petitioner filed a second *Brady* discovery motion arguing that the prosecutor had failed to provide all the evidence in his possession. (*See* 1 CT 134–36). The record does not reveal the trial court's response to this motion. However, on November 14, 2003, the prosecutor filed a letter detailing all of the evidence that he had provided to Petitioner. (*See* 1 CT 137–38). In the letter, the prosecutor explained to Petitioner that he was attaching copies of all the documents

**5.** The transcript of the hearing indicates that Petitioner filed a written motion, (*see* 1 RT 149–A), however, the motion does not appear to be in the record.

that Petitioner claimed not to have. (*See id.*).

Thus, the record belies Petitioner's claims that the prosecutor suppressed evidence. *See, e.g., Dows v. Wood,* 211 F.3d 480, 486–87 (9th Cir.2000) (holding that factually unfounded claims present no basis for federal habeas relief). Indeed, Petitioner's claims about suppressed evidence are vague and completely unsubstantiated. *See, e.g., Phillips v. Woodford,* 267 F.3d 966, 987 (9th Cir.2001) (denying *Brady* claim based on "mere suppositions" (internal quotation marks omitted)); *Jones v. Gomez,* 66 F.3d 199, 204–05 (9th Cir.1995) ("The district court noted that [the petitioner's] *Brady* claim was argued in a single page, without reference to the record or any document. [The petitioner's] conclusory allegations did not meet the specificity requirement. The district court therefore did not err in denying habeas relief on this ground." (internal quotation marks and footnote omitted)). For example, Petitioner claims that the prosecutor failed to "sign and date a written statement attesting that he did provide [P]etitioner the mandatory discovery." (Pet. Memo. at 20). However, the record demonstrates that the prosecutor did exactly that. (*See* 1 CT 137–38). Petitioner further claims that as a result of his discovery requests, he "was the victim of a vindictive prosecution." (Pet. Memo. at 20). Petitioner, however, has failed to provide any facts in support of this conclusory allegation. *See, e.g., James v. Borg,* 24 F.3d 20, 26 (9th Cir.1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

 Having independently reviewed the record, the Court concludes that Petitioner's *Brady* rights were not violated. Moreover, even if Petitioner could show that the prosecution suppressed favorable evidence, Petitioner cannot show prejudice

because the evidence of his guilt was overwhelming. *See supra* Part VI.A.; *see also Schad,* 595 F.3d at 916 ("Finally, and most important, the circumstantial evidence demonstrating [the petitioner's] guilt was powerful, and [he] did not offer any significant evidence to rebut the strong inference of guilt arising from that evidence. In light of the evidence against [the petitioner], any additional impeachment value of the [undisclosed evidence] would not have changed the jury's verdict."); *Allen,* 395 F.3d at 992 ("[T]o the extent that any claim of error ... might be meritorious, we would reject that error as harmless because the evidence of [the petitioner's] guilt is overwhelming."). Thus, the Court concludes that the state courts' denial of this claim was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 2. Ground 2B

 In Ground 2B, Petitioner contends that the trial court violated his constitutional right to self—representation by "fail[ing] to admonish the district attorney for malfeasance/misconduct." (Petition at 5). Specifically, Petitioner argues that the prosecutor instructed Williams not to speak with Petitioner's investigator. (*See* Pet. Memo. at 22). Prosecutorial misconduct warrants habeas relief only if the prosecutor's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (internal quotation marks omitted); *accord Williams v. Stewart,* 441 F.3d 1030, 1042 (9th Cir.2006); *Davis v. Woodford,* 333 F.3d 982, 996 (9th Cir.2003). The Ninth

Circuit has recognized that a prosecutor's interference with a defendant's access to witnesses may constitute misconduct. *See United States v. Black,* 767 F.2d 1334, 1337 (9th Cir.1985) ("Absent a fairly compelling justification, the government may not interfere with defense access to witnesses."); *accord Cacoperdo v. Demosthenes,* 37 F.3d 504, 509 (9th Cir.1994). Even if prosecutorial misconduct is established which rises to the level of a constitutional violation, however, a habeas petitioner must still show that the error was not harmless under the *Brecht* standard.[6] *See Karis v. Calderon,* 283 F.3d 1117, 1128 (9th Cir.2002).

On November 12, 2003, Petitioner filed a motion for a continuance in which he argued that the prosecutor instructed Williams not to speak with Petitioner's investigator. (*See* 1 CT 129–32). Petitioner attached to his motion a memorandum from his investigator which stated as follows:

> **Audrey Williams:** I had a phone conversation with her. She told me that the [prosecutor] told her not to talk to defense investigators. She said that she gave the police a statement and that she was not going to change her story. I read to her the police report in regards to her statements and she told me that it was accurate. Williams would not comment further.

(1 CT 132).

■ During a hearing on December 5, 2003, Petitioner repeated his argument that the prosecutor had been "telling the witnesses not to speak to [his] investigator." (*See* 1 RT 174). The trial court, however, rejected Petitioner's claim by commenting on "the many unfounded charges [Petitioner] ha[d] made." (*See* 1 RT 175). The trial court further stated, "I

think a fair assessment is [Petitioner] is playing games with the [c]ourt and that's what I so find." (*Id.*).

At trial, Williams denied ever telling Petitioner's investigator that the prosecutor told her not to speak with the defense. (*See* 2 RT 294–95). Rather, Williams explained that she told Petitioner's investigator that the prosecutor said she did not have to speak with the defense if she did not want to. (*See* 2 RT 294–95) ("And I told him that I was told that I didn't have to speak to him if I didn't want to."). Thus, the record belies Petitioner's claims that the prosecutor told Williams not to speak with the defense. *See, e.g., Dows,* 211 F.3d at 486–87 (holding that factually unfounded claims present no basis for federal habeas relief).

Moreover, the Ninth Circuit has held that a prosecutor may advise witnesses of their right not to speak with the defense. *See Black,* 767 F.2d at 1338 ("[The prosecutor] merely advised the witnesses of their right to decline the defendant's request for an interview . . . . [T]he prosecutor's letter constituted a correct statement of the law and was not improper."); *accord United States v. Tipton,* 90 F.3d 861, 889 (4th Cir.1996) ("[O]nly access is a matter of right, there is no right to have witnesses compelled to submit to interview, hence no violation by a prosecutor's advising witnesses to that effect."); *see also Cacoperdo,* 37 F.3d at 509 ("In fact, the [witness] had a right not to be interviewed if she so chose.").

■ Having independently reviewed the record, the Court concludes that the prosecutor did not commit misconduct. Moreover, even if Petitioner could show that the prosecutor committed misconduct,

---

6. In *Brecht,* the Supreme Court held that habeas petitioners must show that the complained of error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710 (internal quotation marks omitted).

Petitioner cannot show prejudice because the evidence of his guilt was overwhelming. *See supra* Part VI.A.; *see also Karis,* 283 F.3d at 1128 (explaining that a successful prosecutorial misconduct claim requires a showing of prejudice); *Allen,* 395 F.3d at 992 ("[T]o the extent that any claim of error ... might be meritorious, we would reject that error as harmless because the evidence of [the petitioner's] guilt is overwhelming."). Thus, the Court concludes that the state courts' denial of this claim was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 3. Ground 2C

In Ground 2C, Petitioner contends that the trial court violated his constitutional right to self-representation by "den[ying] [him] the compulsory process for obtaining a defense witness in his favor." (Petition at 5). Specifically, Petitioner argues that the trial court should have granted him a forensic expert to test the gun recovered from the crime scene for fingerprints. (*See* Pet. Memo. at 24). Indeed, the Supreme Court has recognized that indigent defendants have a due process right to obtain the assistance of certain expert witnesses. *See Ake v. Oklahoma,* 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (holding that a defendant had a constitutional right to the appointment of a psychiatrist because his sanity was a "significant factor at trial"); *accord Williams v. Stewart,* 441 F.3d 1030, 1048 (9th Cir. *as amended* April 18, 2006); *Chaney v. Stewart,* 156 F.3d 921, 925 (9th Cir.1998). However, the Supreme Court has declined to consider whether the *Ake* holding extends beyond psychiatrists to other expert witnesses and investigators. *See Caldwell v. Mississippi,* 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) ("We therefore have no need to determine as a matter of federal constitutional law what if any showing would have entitled a defendant to [a criminal investigator, a fingerprint expert, or a ballistics expert]."). The Ninth Circuit has similarly limited the Ake holding to psychiatrists and held that it does not extend to eyewitness identification experts. *See Jackson v. Ylst,* 921 F.2d 882, 886 (9th Cir.1990) ("No issue was presented to the Supreme Court in *Ake* concerning the right of an indigent to the appointment of an expert on eyewitness identification.").

Thus, Petitioner's claim fails because the Supreme Court has not clearly established a constitutional right to the appointment of forensic experts. *See Carey v. Musladin,* 549 U.S. 70, 77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) ("Given the lack of holdings from [the Supreme] Court regarding [the petitioner's claim], it cannot be said that the state court unreasonably applied clearly established Federal law." (internal quotation marks and brackets omitted)); *see also Mennick v. Hardison,* 2009 WL 187889, at *7 (D.Idaho Jan. 26, 2009) ("[T]he United States Supreme Court has not extended Ake beyond appointment of a psychiatrist to answer the question of defendant competency[ ] ... [and] to broaden that application to requiring trial courts to appoint experts to help defendants support other defenses is beyond the scope of *Ake* ...."); *Atcherley v. Scribner,* 2008 WL 4279552, at *9–11 (N.D.Cal. Sept. 16, 2008) (holding that the Supreme Court has not clearly established a constitutional right to the appointment of a medical expert, DNA expert, or fingerprint expert); *Huynh v. Runnels,* 2006 WL 1646140, at *7 (N.D.Cal. June 14, 2006) ("As Respondent points out, there is no clearly—established United States Su-

preme Court authority determining the right of indigent defendants to investigative and other ancillary services. In fact, the Supreme Court expressly has declined to decide that question.").

██ However, even assuming that Petitioner had a constitutional right to the appointment of a forensic expert, Petitioner would have to show some need for the expert. *See Ake,* 470 U.S. at 82–83, 105 S.Ct. 1087 ("When the defendant is able to make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense, the need for the assistance of a psychiatrist is readily apparent."); *see also Williams,* 441 F.3d at 1053 ("For the appointment of an investigator to become constitutionally necessary, the defendant must show that the services of the investigator are required."); *accord United States v. Mikhel,* 552 F.3d 961, 964 (9th Cir.2009).[7] Here, the record demonstrates that Petitioner did not actually have any need for a forensic expert.

On October 8, 2003, Petitioner filed a motion for a continuance in which he argued that he needed a forensic expert. (*See* 1 CT 123–27). At a hearing to discuss Petitioner's motion, Petitioner explained that he needed a forensic expert to test the gun recovered from the crime scene for fingerprints. (*See* 1 RT 167). The prosecutor responded that there were no fingerprints on the gun and that there were no ballistics to examine because the gun was not loaded. (*See* 1 RT 169). After considering arguments from both sides, the trial court denied Petitioner's request because there was no reason to have a forensic expert analyze the gun. (*See* 1 RT 170; *see also* 1 RT 168 ("If [the prosecutor] is telling me that [there were] no fingerprints on the firearm, nor was the firearm fired in the sense of tying the firearm to a

particular bullet[,] . . . I'll deny [the] request[ ] forthwith.")). Thus, even assuming that the Supreme Court has clearly established a constitutional right to the appointment of a forensic expert in some circumstances, the trial court did not violate this right because Petitioner did not actually need a forensic expert.

Moreover, even assuming that the trial court violated Petitioner's constitutional rights, Petitioner cannot show prejudice. *See Chaney,* 156 F.3d at 924 (holding that the trial court's failure to appoint a psychiatrist was subject to the *Brecht* standard for harmless error). First, the testimony presented at trial demonstrates that a forensic expert would not have been able to obtain any fingerprints from the gun. Indeed, Riverside County Sheriff's Department Detective Duke Shane Viveros ("Detective Viveros") testified that he was "very doubtful [the police] could get any prints[ ] off this particular gun" because "[i]t's just a beat up gun" and "[t]here's no . . . gloss to the barrel." (2 RT 385, 403). Detective Viveros explained that gloss on the barrel is where "you'd get a latent print" and that because the gun did not have any gloss, "[i]t would be very hard to obtain a print." (2 RT 403). Second, the evidence of Petitioner's guilt was overwhelming. *See supra* Part VI.A.; *see also Allen,* 395 F.3d at 992 ("[T]o the extent that any claim of error . . . might be meritorious, we would reject that error as harmless because the evidence of [the petitioner's] guilt is overwhelming.").

In a related claim, Petitioner "asserts in light of the foregoing reasons that the pretrial court conspired and lied to [P]etitioner under the pre-text of suppressing the alleged gun and denying [P]etitioner's motion for an expert witness knowing that

---

**7.** Respondent relies on the Ninth Circuit's line of cases involving investigators to conclude that the appointment of an expert witness can be constitutionally mandated. (*See* Ans. Memo. at 37–38).

the alleged firearm was going to be used as evidence during trial." (Pet. Memo. at 27). Petitioner, however, has failed to provide any facts in support of this conclusory allegation and therefore cannot obtain habeas relief. *See, e.g., James,* 24 F.3d at 26.

Having independently reviewed the record, the Court concludes that the trial court did not violate Petitioner's constitutional rights. Thus, the Court concludes that the state courts' denial of this claim was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

## C. *Petitioner Is Not Entitled To Habeas Relief On His Sentencing Claims*

In Grounds 3 and 5C, Petitioner contends that his sentence violated his constitutional rights. (*See* Petition at 6). Specifically, in Ground 3, Petitioner argues that his sentence violates a 1991 plea agreement. (*See id.*). According to Petitioner, "the plea bargain stipulated that [P]etitioner, if convicted of a future serious felony, his sentence would be enhanced up to (5) five years, not 25 years to life under the three strikes law." (Pet. Memo. at 29). In Ground 5C, Petitioner contends that the trial court violated his constitutional rights by imposing consecutive sentences based on facts not found by the jury beyond a reasonable doubt. (*See* Petition at 6). There is no merit to these claims.

### 1. **Ground 3**

Because there is *no reasoned state court* decision addressing Ground 3, this Court conducts an independent review of the record. *See Pirtle,* 313 F.3d at 1167. On April 9, 2004, the trial court imposed an indeterminate term of fifty years to life in state prison plus an additional term of twenty—one years. (2 CT 339). Prior to sentencing, Petitioner admitted to a May 20, 1998 conviction for failing to register as a sex offender in violation of Penal Code section 290(g)(2), an April 25, 1991 conviction for committing a lewd act on a minor in violation of Penal Code section 288(a), and a June 13, 1991 conviction for attempted robbery in violation of Penal Code sections 221 and 664. (*See* 2 RT 488–89). Petitioner further admitted that his 1998 conviction qualified as a prior prison term pursuant to Penal Code section 667.5(b) and that both of his 1991 convictions qualified as serious felonies pursuant to Penal Code section 667(a). (*See id.*). On Count 1 (second degree robbery), the trial court imposed an indeterminate sentence of twenty—five years to life plus an additional ten years for the jury's true finding that Petitioner personally used a firearm within the meaning of Penal Code section 12022.53(b). (*See* 2 RT 494, 502). On Count 3 (possession of a firearm by a felon), the trial court imposed a consecutive indeterminate terra of twenty—five years to life plus an additional consecutive five years each for Petitioner's two serious felony convictions in 1991. (*See* 2 RT 494, 502–03). On Counts 4 and 5 (unlawful sexual intercourse with a minor), the trial court imposed concurrent terms of sixteen months each in state prison. (*See* 2 CT 334). Finally, the trial court imposed an additional consecutive one year term for Petitioner's prior prison term stemming from his 1998 conviction. (*See* 2 RT 503).

 Petitioner contends that his sentence violates a 1991 plea agreement because "the plea bargain stipulated that [P]etitioner, if convicted of a future serious felony, his sentence would be enhanced up to (5) five years, not 25 years to life under the three strikes law." (Pet. Memo. at 29). "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part

of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *see also Morgan v. Gonzales,* 495 F.3d 1084, 1091 (9th Cir. 2007), *cert. denied sub nom., Morgan v. Mukasey,* 552 U.S. 1186, 128 S.Ct. 1290, 170 L.Ed.2d 71 (2008) ("As a general matter of fundamental fairness, promises made by the government to induce either a plea bargain or a cooperation agreement must be fulfilled."). To determine whether a plea agreement has been breached, federal habeas courts apply state contract law principles. *Ricketts v. Adamson,* 483 U.S. 1, 6 n. 3, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987); *accord Davis v. Woodford,* 446 F.3d 957, 962 (2006) ("Under AEDPA, we also must consider whether the California Supreme Court's decision is consistent with a proper application of state contract law in interpreting the plea agreement . . . ."). "Under California law, a contract must be interpreted so as to give effect to the mutual intention of the parties as it existed at the time of contracting." *Davis,* 446 F.3d at 962 (internal quotation marks omitted). Any ambiguity in the plea agreement must be resolved by "looking to the objectively reasonable expectations of the [defendant]." *Buckley v. Terhune,* 441 F.3d 688, 698 (9th Cir.2006) (en banc) (internal quotation marks omitted).

■■ As an initial matter, Petitioner has not explained which of his 1991 convictions he is referring to or provided any evidence of the plea agreement. (*See* Pet. Memo. at 28–32); *see also Dows,* 211 F.3d at 486–87 (holding that factually unfounded claims present no basis for federal habeas relief). Moreover, Petitioner filed a *Romero*[8] motion at sentencing that asked the trial court to strike his 1991 convictions because "[a]t the time of his pleas in

1991, the strike law did not yet exist for his attorney to contemplate in organizing the plea." (2 CT 265). Thus, the record demonstrates that Petitioner's 1991 plea agreements in fact did not contemplate any future sentence enhancements under California's Three Strikes law. (*See id.*).

■■ Petitioner contends that his 1991 plea agreements were involuntary because "if [P]etitioner would have known or been advised that the plea bargain and contract he entered into, in 1991, and known that it would be used against him to aggravate his sentence in a later proceeding, [P]etitioner would not have entered into a contract agreement." (Pet. Memo. at 29). However, Petitioner is foreclosed from challenging the voluntariness of his 1991 prior convictions. *See Lackawanna County Dist. Atty. v. Coss,* 532 U.S. 394, 403–04, 121 S.Ct. 1567, 149 L.Ed.2d 608 (2001). In *Lackawanna,* the United States Supreme Court held that, in general, habeas relief is not available to petitioners who challenge a fully expired conviction used to enhance a subsequent sentence in a petition brought under 28 U.S.C. § 2254:

> [O]nce a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid. If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained.

*Id.* (citation omitted).

■■ The only exception to the rule barring challenges to prior convictions

---

**8.** California law recognizes that a trial court may, in its discretion, strike a prior conviction. *See People v. Superior Court (Romero),* 13 Cal.4th 497, 53 Cal.Rptr.2d 789, 917 P.2d 628 (1996); Penal Code § 1385.

used to enhance current sentences includes situations in which there was a failure to appoint counsel in violation of the Sixth Amendment in the case that resulted in the prior conviction. *See Lackawanna,* 532 U.S. at 404, 121 S.Ct. 1567. In the instant case, Petitioner does not assert that he was denied counsel in violation of the Sixth Amendment when he entered the guilty pleas in his 1991 convictions. (*See* Pet. Memo. at 28–32). Thus, Petitioner's claim does not fit within the narrow exception to non-reviewability established in *Lackawanna.*

Moreover, even assuming that Petitioner could challenge the voluntariness of his 1991 plea agreements, the Ninth Circuit has held that plea agreements are not rendered involuntary by a defendant's lack of understanding that their conviction could be used to enhance a future sentence. *See United States v. Brownlie,* 915 F.2d 527, 528 (9th Cir.1990) ("The possibility that the defendant will be convicted of another offense in the future and will receive an enhanced sentence based on an instant conviction is not a direct consequence of a guilty plea."); *see also Davis,* 446 F.3d at 962 ("We recognize that, in California, contracts (including plea bargains) are deemed to incorporate and contemplate not only the existing law but the reserve power of the state to amend the law or enact additional laws." (internal quotation marks omitted)).

 Finally, Petitioner makes a number of vague assertions that the use of his prior convictions to enhance his sentence violated his rights under the Fifth and Eighth Amendments as well as constituted a bill of attainder and an *ex post facto* law. (*See* Pet. Memo. at 28, 30–31). However, the Supreme Court has "repeatedly upheld recidivism statutes against contentions that they violate constitutional strictures dealing with double jeopardy, *ex post facto* laws, cruel and unusual punishment, due

process, equal protection, and privileges and immunities." *Parke v. Raley,* 506 U.S. 20, 27, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992) (internal quotation marks omitted).

Having independently reviewed the record, the Court concludes that Petitioner's sentence does not violate any 1991 plea agreement. Thus, the Court concludes that the state courts' denial of this claim was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

**2. Ground 5C**

On direct review, the California Court of Appeal rejected Ground 5C by determining that U.S. Supreme Court precedent had not addressed the issue of consecutive sentencing. (*See* Lodgment 8 at 20) ("Neither *Apprendi* nor *Blakely* addressed the matter of consecutive terms."). In the absence of controlling authority from the U.S. Supreme Court, the court of appeal relied on California precedent holding that there is no presumption of concurrent sentencing under California law. (*See id.* at 22) ("There is no statutory provision making concurrent sentencing the presumptive norm."). Thus, the court of appeal concluded that the imposition of a consecutive sentence did not increase the statutory maximum such that Petitioner was entitled to a jury determination of the justifying facts. (*See id.* at 21–23).

 Here, Petitioner argues that the trial court's imposition of consecutive terms based on facts not found by the jury beyond a reasonable doubt violated his constitutional rights. (*See* Pet. Memo., Exh. 8 at 30–37). Petitioner's argument is foreclosed, however, by the U.S. Supreme

Court's recent opinion in *Oregon v. Ice,* — U.S. ——, 129 S.Ct. 711, 172 L.Ed.2d 517 (2009). In *Ice,* the Supreme Court held that "[t]he decision to impose sentences consecutively is not within the jury function." *Ice,* 129 S.Ct. at 717. As explained by the Supreme Court:

> The historical record demonstrates that the jury played no role in the decision to impose sentences consecutively or concurrently.... [¶] In light of this history, legislative reforms regarding the imposition of multiple sentences do not implicate the core concerns that prompted our decision in *Apprendi* [*v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)].... [¶] *Cunningham* [*v. California,* 549 U.S. 270, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007)] thus does not impede our conclusion that, as *Apprendi*'s core concern is inapplicable to the issue at hand, so too is the Sixth Amendment's restriction on judge—found facts.

*Id.* at 717–18. Because the use of judge—found facts to impose consecutive rather than concurrent sentences does not implicate the Sixth Amendment, Petitioner's claim is not cognizable on federal habeas review. *See, e.g., Cacoperdo,* 37 F.3d at 507 ("The decision whether to impose sentences concurrently or consecutively is a matter of state criminal procedure and is not within the purview of federal habeas corpus."); *see also People v. Black,* 41 Cal.4th 799, 823, 62 Cal.Rptr.3d 569, 161 P.3d 1130 (2007), *cert. denied,* 552 U.S. 1144, 128 S.Ct. 1063, 169 L.Ed.2d 813 (2008) ("The determination whether two or more sentences should be served [consecutively] is a sentencing decision made by the judge after the jury has made the factual findings necessary to subject the defendant to the statutory maximum sentence on each offense and does not implicate the defendant's right to a jury trial on facts that are the functional equivalent of elements of an offense." (internal quotation marks and brackets omitted)).

In sum, the Court concludes that the state courts' denial of this claim was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

**D. *Petitioner Is Not Entitled To Habeas Relief On His Claim Regarding Excluded Evidence***

In Ground 5A, Petitioner contends that the trial court violated his constitutional rights by excluding evidence of the victim's prior bad acts. (*See* Petition at 6). Specifically, Petitioner argues that the trial court should have admitted evidence that Schmidt threatened to kill his wife and was involved in a bar fight. (*See* Pet. Memo., Exh. 8 at 16–17; 1 RT 199–200, 206–08). There is no merit to this claim.

 Criminal defendants have a constitutional right to present relevant evidence in their own defense. *See, e.g., Holmes v. South Carolina,* 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." (internal quotation marks omitted)). "However, a defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions, such as evidentiary and procedural rules." *Moses v. Payne,* 555 F.3d 742, 757 (9th Cir.2009) (internal quotation marks, brackets and citation omitted). Indeed, "[s]tate and

federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes,* 547 U.S. at 324, 126 S.Ct. 1727 (internal quotation marks omitted); *see also Moses,* 555 F.3d at 757 ("[T]he Supreme Court has indicated its approval of well—established rules of evidence that permit trial judges to exclude evidence *if* its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." (internal quotation marks and brackets omitted)).

■ Thus, the exclusion or restriction of evidence pursuant to a state evidentiary rule is unconstitutional only where it "significantly undermined fundamental elements of the defendant's defense." *United States v. Scheffer,* 523 U.S. 303, 315, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998); *see also Moses,* 555 F.3d at 757 ("Evidentiary rules do not violate a defendant's constitutional rights unless they infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." (internal quotation marks and brackets omitted)). In sum, it takes "unusually compelling circumstances to outweigh the strong state interest in administration of its trials." *Moses,* 555 F.3d at 757 (internal quotation marks and ellipsis omitted).

On March 3, 2004, Petitioner's trial counsel moved to admit evidence of Schmidt's threats to kill his wife and Schmidt's involvement in a bar fight. (*See* 1 RT 199–200, 206–208). Petitioner's trial counsel argued that these prior bad acts were relevant to Schmidt's credibility. (*See* 1 RT 206). After considering arguments from both sides, the trial court ruled that the evidence should be excluded. (*See* 1 RT 209–10). The trial court explained that Schmidt's threats against his wife were "extremely inflammatory," (1 RT 209), and that Schmidt's involvement in a bar fight was not relevant to his credibility. (*See* 1 RT 210).

On direct review, the California Court of Appeal rejected Ground 5A as follows:

a. *Admissibility as impeachment evidence under Wheeler*

We conclude the prior misconduct was relevant to the issue of Schmidt's credibility. As stated, under *Wheeler,* "[m]isconduct involving moral turpitude may suggest a willingness to lie" and therefore may be used to impeach a witness's credibility. (*[People v.] Wheeler, supra,* [ (1992) ] 4 Cal.4th 284, 295–296 [14 Cal. Rptr.2d 418, 841 P.2d 938].) Making a criminal threat in violation of Penal Code section 422 is a crime of moral turpitude. (*People v. Thornton* (1992) 3 Cal.App.4th 419, 424 [4 Cal.Rptr.2d 519].) Similarly, assault with a deadly weapon in violation of Penal Code section 245, subdivision (a)(1) is a crime of moral turpitude. (*People v. Elwell* (1988) 206 Cal.App.3d 171, 175 [253 Cal. Rptr. 480].)

The People contend one cannot tell from the record whether Schmidt's prior conduct satisfied all of the elements of Penal Code sections 422 and 245, subdivision (a)(1). However, as stated, to be admissible for impeachment, it is not necessary that misconduct constitute a criminal offense, only that it involve moral turpitude, i.e., "a 'readiness to do evil.'" (*Wheeler, supra,* 4 Cal.4th 284, 289–291, 297, fn. 7 [14 Cal.Rptr.2d 418, 841 P.2d 938].) We think it is reasonably inferable that threatening to kill one's ex-wife, threatening to do an "O.J." on her while holding a knife, and participating in a fight involving the use of pool cues and balls as weapons and that results in a conviction for assault with a deadly weapon, all show a readiness to do evil, at least for the purpose of determining admissibility.

We also conclude it was not necessary to show there was an immediate prospect of execution of the telephone threat for the threat to qualify as conduct involving moral turpitude. As the court itself acknowledged, Penal Code section 422 "does not require an immediate ability to carry out the threat. [Citation.]" (*People v. Lopez* (1999) 74 Cal.App.4th 675, 679 [88 Cal.Rptr.2d 252]; *accord, People v. Gaut* (2002) 95 Cal.App.4th 1425, 1432 [115 Cal.Rptr.2d 924]; *In re David L.* (1991) 234 Cal.App.3d 1655, 1660 [286 Cal.Rptr. 398].) We are not aware of any authority supporting the court's view that, notwithstanding this settled principle of law, an immediate ability to carry out the threat must be shown "when people get upset and emotional over the phone because of domestic incidents . . . ."

To the contrary, the plain language of Penal Code section 422 makes clear that a threat made over the telephone, despite the fact it cannot be immediately executed, qualifies as a violation of the statute. Section 422 applies to a statement "made verbally, in writing, *or by means of an electronic communication device* . . . ." The statute defines "electronic communication device" to include "telephones. cellular telephones, computers, video recorders, fax machines, or pagers." ( [Emphasis] added.)

Accordingly, we conclude Schmidt's prior misconduct was admissible to impeach his credibility under *Wheeler.* The remaining issue affecting admissibility is whether the evidence was subject to exclusion under Evidence Code section 352.

b. *Evidence Code Section 352*

Whether Schmidt's prior misconduct was admissible for impeachment under Evidence Code section 352 depended on whether its admission would involve undue time consumption, confusion, or prejudice that would substantially outweigh its probative value. (§ 352; *Wheeler, supra,* 4 Cal.4th 284, 297 [14 Cal.Rptr.2d 418, 841 P.2d 938].)

Admission of Schmidt's prior misconduct clearly would not have involved undue time or confusion if he simply admitted engaging in the conduct. Presumably, he at least would have admitted the assault with a deadly weapon, since, according to the court, he pled to that charge.

If Schmidt denied the threats, they could have been proved with testimony from the victim(s). Alternatively, the threats could have been proved with testimony from the police officer(s) who investigated the threats, to the extent Schmidt made any statements during the investigations that were inconsistent with his denial of the misconduct at trial. (Evid.Code, § 1235.)

There is no reason to believe either of these methods of proof would have unduly confused the jury or prolonged the trial. A standard instruction to the jury explaining the relevance of the misconduct to Schmidt's credibility could have avoided any confusion. Similarly, there was no indication, at least at the time the court ruled, that the People would contest proof of the misconduct so vigorously as to consume undue time. In fact the court did not know, when it ruled, whether Schmidt would even deny the misconduct.

We further conclude that admitting the moral turpitude evidence would not have essentially derailed the focus of the trial. The main issue in the trial was the identity of the robber. Schmidt was one of the eyewitnesses to the robbery and the one who likely had the best opportunity to look at the perpetrator.

Finally, we cannot agree with the court's conclusion that the probative val-

ue of the moral turpitude evidence was outweighed by its potential for prejudice. The court thought the evidence would be unduly "inflammatory." However, it overlooked the relevant question: inflammatory against whom?

In *People v. Scheid* (1997) 16 Cal.4th 1 [65 Cal.Rptr.2d 348, 939 P.2d 748], the Supreme Court noted that " '[w]e have described the "prejudice" referred to in Evidence Code section 352 as characterizing evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues. [Citation.]' " (*Id.* at p. 19 [65 Cal. Rptr.2d 348, 939 P.2d 748]; *accord. People v. Hart* (1999) 20 Cal.4th 546, 616 [85 Cal.Rptr.2d 132, 976 P.2d 683]; *People v. Smithey* (1999) 20 Cal.4th 936, 974 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) Allowing the impeachment of Schmidt with prior misconduct had no tendency to "to evoke an emotional bias against a party as an individual." Schmidt was not a party. The only party whose interests were at stake, the People, was not an individual.

The Supreme Court, in fact, has recognized that prejudice is not an issue where the witness who is impeached with prior misconduct is not the accused. In *Wheeler, supra,* 4 Cal.4th 284 [14 Cal.Rptr.2d 418, 841 P.2d 938], the court held Evidence Code section 352 did not preclude the prosecution from impeaching a defense witness with prior misdemeanor grand theft conduct, stating: "This was not a case in which the prosecution sought to impeach an *accused* witness with evidence of her prior crimes. Hence, there was no danger that the prior—crimes evidence would create unfair prejudice on the issue of guilt or innocence." (*Wheeler,* at p. 297, fn. 9 [14 Cal.Rptr.2d 418, 841 P.2d 938].)

For these reasons, we conclude the moral turpitude evidence was admissible to impeach Schmidt's credibility.

#### c. *Prejudice*

Although we have concluded the moral turpitude evidence was admissible, its exclusion only warrants reversal if a miscarriage of justice resulted. (Evid. Code, § 354.) Under the "miscarriage of justice" standard, "a trial court error generally is not reversible unless there is a reasonable probability that the defendant was prejudiced as a result of the error. [Citations.]" (*People v. Crayton* (2002) 28 Cal.4th 346, 364 [121 Cal. Rptr.2d 580, 48 P.3d 1136].)

[Petitioner] contends the exclusion of the evidence was prejudicial because it permitted Schmidt, the sole complaining victim in this case, to testify under a false veil of credibility. The fact Schmidt was the sole complaining victim was hardly significant in assessing prejudice. There were two other eyewitnesses, Sanchez and Williams, who saw the incident from close range, just as Schmidt did. Whether they were classified as complaining witnesses did not affect the probative value of their testimony identifying [Petitioner] as the perpetrator.

[Petitioner] notes Williams was only "pretty sure" of her identification when she picked [Petitioner's] photo out of a six—photo lineup three days after the incident. He also notes: Williams did not tell the police about [Petitioner's] distinctive nose, which she testified at trial was a feature by which she identified him; Williams refused to be interviewed by the defense; and Williams disagreed with the other eyewitnesses on whether the gunman held the gun with one or two hands.

Some of these points—the refusal to be interviewed, the question how the

gunman held the gun—were too inconsequential to cast any serious doubt on Williams's identification. Moreover, that identification was corroborated not only by Schmidt but by Sanchez. [Petitioner] does not suggest Sanchez's identification was equivocal, instead merely pointing out inconsistencies between her description of the sequence of the events of the robbery and the sequence as described by the other eyewitnesses.

These inconsistencies, however, even if they cast doubt on the exact sequence of events on December 9, 2002, had nothing to do with the issue of whether [Petitioner] was the gunman. It was not disputed that *someone* came out of the house, pulled a gun, and ordered Schmidt to hand over his wallet. Whether the events unfolded as described by one witness or another had no bearing on who committed the crime.

[Petitioner] asserts there was no evidence tying him to the crime other than the testimony of the three eyewitnesses. Assuming more evidence was required, it was provided by the facts that, two days after the incident, both [Petitioner] and the gun were found at the house. Of course, it is conceivable, as [Petitioner] conjectures, that he was merely a guest at the house, and the gun might have been someone else's since it was found in the backyard and was not tested for fingerprints. However, it is not reasonably likely a juror would accept the doubtful proposition that the presence of both [Petitioner] and the gun at the house were merely coincidental, and [Petitioner] had nothing to do with the robbery.

On this record, it is not reasonably likely that, had the jury heard the moral turpitude evidence against Schmidt, a juror would have (1) disbelieved Schmidt's identification of [Petitioner] because of his prior misconduct; (2) disbelieved Sanchez's and Williams's identi-

fications of [Petitioner] as well, as too weak and inconsistent to be believed; and (3) rejected the fact [Petitioner] and the gun were found at the house shortly after the crime as proof [Petitioner] was the perpetrator. The evidence suggested no other occupant of the house who had a physical appearance similar to [Petitioner's] and who possibly might have committed the robbery. The exclusion of the moral turpitude evidence was not prejudicial.

### d. *Federal constitutional error*

[Petitioner] contends that even if the exclusion of the evidence was not prejudicial when evaluated under the reasonable probability standard, it was prejudicial under the more stringent standard for federal constitutional error, because it was not harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065].) However, [Petitioner] acknowledges that application of the ordinary rules of evidence, even if they are applied incorrectly, generally does not impermissibly infringe on the constitutional right to present a defense. [Petitioner] argues this case did not fall within the general rule but offers no supporting authority for that assertion other than quotations, with no factual context, from decisions affirming the importance of the right to present a defense. In particular, [Petitioner] cites no authority suggesting that a ruling such as this one—exclusion of past misconduct on the part of one of three eyewitnesses positively identifying [Petitioner] as the perpetrator—amounts to federal constitutional error. We therefore reject his constitutional claim. (Lodgment 8 at 8–14).

As set forth above, the court of appeal determined as a matter of state law

that the trial court should have allowed Petitioner to impeach Schmidt with the proffered evidence. (*See* Lodgment 8 at 11) ("For these reasons, we conclude the moral turpitude evidence was admissible to impeach Schmidt's credibility."). However, "federal habeas corpus relief does not lie for errors of state law." *McGuire,* 502 U.S. at 67, 112 S.Ct. 475 (internal quotation marks omitted). Rather, to obtain relief on federal habeas review, Petitioner must show that the trial court's exclusion of the proffered impeachment evidence had a "substantial and injurious effect or influence in determining the jury's verdict." *Moses,* 555 F.3d at 760 (internal quotation marks omitted).

■■■ Here, Petitioner cannot show prejudice because the evidence of his guilt was overwhelming. *See Moses,* 555 F.3d at 760 ("In light of the evidence admitted by the trial court, even assuming that the trial court's exclusion of evidence was a constitutional error, we agree that it did not have substantial and injurious effect or influence in determining the jury's verdict.") (internal quotation marks omitted). As pointed out by the court of appeal, Petitioner's proffered impeachment evidence related only to Schmidt and did nothing to undermine the testimony of either Sanchez or Williams. (*See* Lodgment 8 at 12) ("There were two other eyewitnesses, Sanchez and Williams, who saw the incident from close range, just as Schmidt did."). Thus, the Court concludes that the state courts' denial of this claim was neither contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

### E. *Petitioner Is Not Entitled To Habeas Relief On His Claims Regarding Ineffective Assistance of Trial Counsel*

In Ground 1, Petitioner contends that his trial counsel rendered ineffective assistance by failing to: (A) "challenge the tainted in court identification"; (B) raise the issue "that Petitioner's *Miranda* rights were violated"; (C) "make an adequate and timely proffer of alleged victim's bad act—priors to impeach his veracity"; (D) "request limited jury instruction[s]"; (E) "object during trial to evidence that was suppressed"; and (F) demonstrate "that alleged witness participated to this alleged robbery." (Petition at 5) (emphasis added). There is no merit to these claims.

To prevail on a claim of ineffectiveness of counsel, a petitioner must show two things. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Douglas v. Woodford,* 316 F.3d 1079, 1085 (9th Cir.2003) (citing *Strickland* ). First, he must establish that counsel's performance was "deficient" in that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052; *see also Sims v. Brown,* 425 F.3d 560, 584 (9th Cir.2005) (citing the "well—settled" legal framework of *Strickland* ). Second, he must demonstrate that the deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *Sims,* 425 F.3d at 584. To satisfy the first prong, the acts or omissions must fall "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. A petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. 2052.

■ A deficient performance prejudices a defense if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. A reasonable probability is one sufficient to undermine confidence in the outcome. *See id.* The second prong of *Strickland* thus "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. 2052. A petitioner bears the burden of establishing both components of the *Strickland* standard, and a court may reject an ineffectiveness claim upon finding either that counsel's performance was reasonable or that the claimed error was not prejudicial. *Id.* at 687, 697, 104 S.Ct. 2052; *Thomas v. Borg,* 159 F.3d 1147, 1151–52 (9th Cir. 1998).

■■ Moreover, a habeas court's review of a claim under the *Strickland* standard is "doubly deferential." *Knowles v. Mirzayance,* — U.S. ——, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009). The relevant question "is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Id.* (citations omitted). Finally, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.*

### 1. Ground 1A

■ In Ground 1A, Petitioner contends that his trial counsel should have "challenge[d] the tainted in court identification." (Petition at 5). Specifically, Petitioner argues that Schmidt and Sanchez identified Petitioner "under highly suggestive circumstances" because "they sat together in a car right outside the alleged crime scene." (Pet. Memo. at 2). Due process protects against the admission of evidence derived from impermissibly suggestive pretrial identification procedures. *See Neil v. Biggers,* 409 U.S. 188, 196, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *accord United States v. Drake,* 543 F.3d 1080, 1088 (9th Cir.2008). However, even a suggestive identification procedure does not violate a defendant's due process rights if "under the totality of the circumstances the identification was reliable." *Drake,* 543 F.3d at 1088 (internal quotation marks omitted). Factors to be considered include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* (internal quotation marks and ellipses omitted). To prevail on habeas review, Petitioner must show that "the confrontation conducted in this case was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." *Johnson v. Sublett,* 63 F.3d 926, 929 (9th Cir.1995); *accord Williams,* 441 F.3d at 1038.

Because there is no reasoned state court decision addressing Ground 1A, this Court conducts an independent review of the record. *See Pirtle,* 313 F.3d at 1167. At trial, Detective Viveros testified that he asked Schmidt and Sanchez to come to the scene of the robbery on December 11, 2002, for a field identification. (*See* 2 RT 385–86, 388). Schmidt testified that he and Sanchez drove together to the residence, parked outside, and stayed in their car. (*See* 2 RT 352–53). Detective Viveros explained that before he allowed Schmidt or Sanchez to view anyone, he gave them the following admonition:

You are being asked to participate in an in—field identification. You should not conclude or guess that the person detained is a person who committed a crime. You are not obligated to identify anyone. It is just as important to free innocent parties from suspicion as it is to identify guilty parties. Please do not discuss the case with any other witnesses or indicate in any way that you have or have not identified someone except to me.

(2 RT 389) (internal quotation marks omitted). After the admonition, Detective Mullin brought Petitioner out of the residence in handcuffs, (see 2 RT 406–07), and both Schmidt and Sanchez identified Petitioner as the man that held a gun to Schmidt's head. (See 2 RT 391).

Petitioner argues that Schmidt and Sanchez simply agreed with each other in making their identifications because they "were boy—friend and girlfriend." (Trav. Memo. at 2). However, Detective Viveros explained that Schmidt and Sanchez did not communicate with each other when they made their identifications, (see 2 RT 392), and they could not hear what the other person was saying. (See 2 RT 389).

■ Petitioner further argues that the identification procedure was "highly suggestive" because he "was led out of the perpetrator's house by law enforcement," "was handcuffed," and "was the only Mexican male present." (Pet. Memo. at 2). However, the Supreme Court has upheld the use of one—person field line—ups when called for by the circumstances of a case. See, e.g., Stovall v. Denno, 388 U.S. 293, 295, 301–02, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), overruled on other grounds by, Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (explaining that a one—man field line—up at the hospital bed of an ill victim where the suspect was escorted by police and wearing handcuffs was justified by "the need

for immediate action"); see also Simmons v. United States, 390 U.S. 377, 384–85, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (approving of photographic line-up that contained only pictures of the two suspects because "[i]t was essential for the FBI agents swiftly to determine whether they were on the right track, so that they could properly deploy their forces"); United States v. Jones, 84 F.3d 1206, 1210 (9th Cir.1996) ("The fact that only one suspect is presented for identification does not make the identification procedure invalid."). Here, a one—person field line—up was appropriate because the police had detained a man they believed to be the perpetrator that held a gun to Schmidt's head at the location the victims had identified as the scene of the crime. (See 2 RT 386–87).

Additionally, the Ninth Circuit has rejected the argument that handcuffs or other indicia of custody render an identification procedure impermissibly suggestive. See Drake, 543 F.3d at 1089 (rejecting argument that identification procedure was impermissibly suggestive because the defendant was handcuffed and surrounded by uniformed police officers); United States v. Kessler, 692 F.2d 584, 586 (9th Cir.1982) ("The use of handcuffs or other indicia of custody will not invalidate a show—up, at least where necessary for the prompt and orderly presentation of the suspect, consistent with protection of the officers and witnesses."). Indeed, Detective Viveros gave Schmidt and Sanchez a thorough admonishment which instructed them not to "conclude or guess that the person detained is a person who committed a crime." (2 RT 389) (internal quotation marks omitted). Thus, the Court concludes that the identification procedure was not impermissibly suggestive.

■ Regardless, the identifications in this case were extremely reliable. First, both Schmidt and Sanchez had excellent

opportunities to view the perpetrator at the time of the crime. Indeed, Schmidt testified that he spoke with the perpetrator and discussed how much money Schmidt had before the perpetrator pulled out a gun. (*See* 2 RT 341, 343). Schmidt further testified that although it was dark outside, there was a streetlight. (2 RT 358). Sanchez testified that she observed the perpetrator from only five or six feet away, (*see* 2 RT 258), and that the incident outside the residence lasted for approximately fifteen minutes. (*See* 2 RT 266–67).

Second, Sanchez accurately described Petitioner to the police before the line—up.[9] Indeed, Sanchez described Petitioner as a Hispanic male adult, about five feet three inches tall, with tattoos around his neck and chest, and wearing a white tank top and a black jacket. (*See* 2 RT 327). The evidence presented at trial showed that Petitioner was a Hispanic male, about five feet three or four inches tall, (*see* 2 RT 359), with tattoos around his neck, and wearing a white tank top, (*see* 2 RT 269), and a "bluish black" jacket. (2 RT 393).

Third, both Schmidt and Sanchez were extremely certain of their identifications. Indeed, Schmidt testified that he was "[a] hundred percent positive" when he identified Petitioner as the man who pointed a gun to his head. (2 RT 354). On redirect, Schmidt explained that he identified Petitioner "[b]ecause he was the one that pointed the gun at [his] head" and did not "assume that [Petitioner] was [the perpetrator] just because he was there being detained by police." (2 RT 368). Sanchez similarly testified that she was "[v]ery positive" that Petitioner was "the same person that put the gun to [Schmidt's] head." (2 RT 241). Sanchez explained that Petition-

er "looked exactly the same" and she specifically noticed Petitioner's crooked nose and tattoos. (*See* 2 RT 236, 241).

Fourth, Schmidt and Sanchez identified Petitioner less than forty—eight hours after the crime. Indeed, Sanchez testified that the crime occurred at approximately 8:30 or 9:00 p.m. on December 9, 2002, (see 2 RT 216, 226), and that the line-up took place at approximately 12:00 or 1:00 p.m. on December 11, 2002. (*See* 2 RT 237–38). Finally, Williams did not participate in the field line—up, (*see* 2 RT 406), but also identified Petitioner as the person that held a gun against Schmidt's right temple. (*See* 2 RT 284, 286–87).

■■■ In sum, having independently reviewed the record, the Court concludes that the identification procedure was not impermissibly suggestive and that even if it was, the identifications were reliable under the totality of the circumstances. Thus, trial counsel's performance was not deficient because challenging the identifications would have been futile. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) ("[T]rial counsel cannot have been ineffective for failing to raise a meritless objection."); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir.1996) ("[T]he failure to take a futile action can never be deficient performance."). As the motion would have been futile and because the evidence of Petitioner's guilt was overwhelming, Petitioner cannot show prejudice. *See Toomey v. Bunnell*, 898 F.2d 741, 744 (9th Cir.1990) ("In short, we find the prospects of success of the motion to suppress too remote for counsel's failure to have pressed it to have constituted a Sixth Amendment violation, The connection between a motion to suppress and a reason-

9. As noted by Respondent, Schmidt's initial description of Petitioner to the police does not appear in the record. (*See* Ans. Memo. at 15) ("Petitioner's trial counsel did not impeach

Mr. Schmidt's initial description to the police of the male assailant with any statements he made at that time.").

able likelihood of a different verdict is even more attenuated."). Thus, the Court concludes that the state courts' denial of this claim was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 2. Ground 1B

In Ground 1B, Petitioner contends that his trial counsel should have raised the issue "that Petitioner's *Miranda* rights were violated." (Petition at 5) (emphasis added). Specifically, Petitioner argues that the identifications by Schmidt and Sanchez were "tainted" because the police did not inform him of his *Miranda* rights prior to the line—up. (Pet. Memo. at 5). Because there is no reasoned state court decision addressing Ground 1B, this Court conducts an independent review of the record. *See Pirtle*, 313 F.3d at 1167.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that police must inform suspects in custody of the right to remain silent and the right to obtain the assistance of counsel before subjecting the suspect to interrogation. *Id.* at 469–73, 86 S.Ct. 1602; *accord Davis v. United States*, 512 U.S. 452, 457, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). The Supreme Court has explained that the right to counsel enunciated in *Miranda* is not required by the Fifth Amendment, but rather is a safeguard designed to insure against compulsory self—incrimination. See *Davis*, 512 U.S. at 458, 114 S.Ct. 2350 ("[T]his prohibition on further questioning—like other aspects of *Miranda*—is not itself required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose." (internal quotation marks omitted)).

■ Here, however, the identifications by Schmidt and Sanchez did not violate Petitioner's *Miranda* rights because the police did not interrogate him during the identification process. *See Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) ("[T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."). Indeed, as noted by Respondent, "there was no evidence at trial as to any statements Petitioner may have made to law enforcement." (Ans. Memo. at 18). Moreover, even assuming that the police somehow violated Petitioner's *Miranda* rights during the identifications by Schmidt and Sanchez, Petitioner cannot show prejudice because Williams also identified Petitioner as the person that held a gun against Schmidt's right temple. (*See* 2 RT 284, 286–87); *see also Laboa v. Calderon*, 224 F.3d 972, 977–78 (9th Cir.2000) (holding *Miranda* violation harmless because cumulative of other evidence admitted at trial).

■ In sum, having independently reviewed the record, the Court concludes that the identifications by Schmidt and Sanchez did not violate Petitioner's *Miranda* rights and that even if they did, Petitioner cannot show prejudice. Thus, trial counsel's performance was not deficient because challenging the identifications would have been futile. *See Juan H.*, 408 F.3d at 1273 ("[T]rial counsel cannot have been ineffective for failing to raise a meritless objection."); *Rupe*, 93 F.3d at 1445 ("[T]he failure to take a futile action can never be deficient performance."). For the same reason, Petitioner cannot show prejudice. *See Toomey*, 898 F.2d at 744 ("In short, we find the prospects of success of the motion to suppress too remote for counsel's failure to have

pressed it to have constituted a Sixth Amendment violation. The connection between a motion to suppress and a reasonable likelihood of a different verdict is even more attenuated."). Thus, the Court concludes that the state courts' denial of this claim was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 3. Ground 1C

■■■ In Ground 1C, Petitioner contends that his trial counsel should have "ma[d]e an adequate and timely proffer of alleged victim's bad act-priors to impeach his veracity." (Petition at 5). Specifically, Petitioner argues that "defense counsel's proffer of impeachment of [sic] evidence was inadequate" because it did not include information about Schmidt's threats to kill his wife and Schmidt's involvement in a bar fight. (Pet. Memo. at 6). Petitioner further argues that his "defense counsel had ample time to review the police reports, talk to witnesses, and make an adequate and timely proffer of alleged victim David Schmidt's impeachment evidence." (*Id.* at 7).

Because there is no reasoned state court decision addressing Ground 1C, this Court conducts an independent review of the record. *See Pirtle,* 313 F.3d at 1167. On March 3, 2004, Petitioner's trial counsel moved to admit evidence of Schmidt's threats to kill his wife and Schmidt's involvement in a bar fight. (*See* 1 RT 199–200, 206–208). Petitioner's trial counsel acknowledged receiving police reports about the incidents, but stated that the reports had been misplaced. (*See* 1 RT 207). The trial court indicated that it would not admit this evidence, but stated that defense counsel could re-raise the is-

sue after locating the police reports. (*See* 1 RT 209).

Petitioner raised this issue on direct review, not as an ineffective assistance claim, but as a challenge to the trial court's exclusion of impeachment evidence. (*See* Lodgment 5, Appellant's Opening Brief ("Lodgment 5") at 16–19); *see also supra* Part VI. D. The California Court of Appeal determined that Petitioner's trial counsel adequately raised the issue before the trial court. (*See* Lodgment 8 at 7) ("Here, the record of the pretrial hearing demonstrates that the court had, at least, sufficient information to make an informed ruling on the admissibility of the evidence."). The court of appeal further found that Petitioner's trial counsel did not need to re—raise the issue. (*See id.* at 7–8) ("Although the court said it might reconsider its ruling if [Petitioner] so desired after reviewing the police reports, there is no indication that the reports contained any additional facts that might have changed the ruling. Therefore, we conclude, [Petitioner] was not required to raise the admissibility question again in order to preserve it for appeal.").

■■■ Thus, having independently reviewed the record, the Court concludes that Petitioner has failed to meet his burden to show that trial counsel's performance was deficient. *See Murtishaw,* 255 F.3d at 939 ("The defendant bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy."). Moreover, even assuming that Petitioner's trial counsel rendered ineffective assistance, Petitioner cannot show prejudice. *See Toomey,* 898 F.2d at 743 ("[P]etitioner must further show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different."). Indeed, even if Petitioner's trial counsel had completely impeached

Schmidt's testimony, the evidence of Petitioner's guilt still would have been overwhelming. *See Allen,* 395 F.3d at 992 ("[T]o the extent that any claim of error . . . might be meritorious, we would reject that error as harmless because the evidence of [the petitioner's] guilt is overwhelming."). As set forth above, *see supra* Part VI.A., both Sanchez and Williams testified that Petitioner held a gun against Schmidt's right temple and demanded Schmidt's money. (*See* 2 RT 230, 284, 286–87).

In sum, the Court concludes that the state courts' denial of this claim was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 4. Ground 1D

■ In Ground 1D, Petitioner contends that his trial counsel should have "request[ed] limited jury instruction[s]." (Petition at 5). Specifically, Petitioner argues that his trial counsel should have requested a limiting instruction "as to the limited use of [P]etitioner's prior felony conviction as to count 3." (Pet. Memo. at 8). Because there is no reasoned state court decision addressing Ground 1D, this Court conducts an independent review of the record. *See Pirtle,* 313 F.3d at 1167.

As set forth above, *see supra* Part VI.A., a limiting instruction was not necessary because the parties' stipulation clearly explained that Petitioner's prior felony conviction was being admitted "for purposes of Count 3 of the amended Information." (*See* 2 RT 273) ("Both the People and the defense stipulate that [Petitioner] received a felony conviction on May 20th, 1998, for purposes of County 3 of the amended In-

formation."). Thus, having independently reviewed the record, the Court concludes that Petitioner has failed to meet his burden to show that trial counsel's performance was deficient. *See Murtishaw,* 255 F.3d at 939 ("The defendant bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy.").

■ Petitioner further argues that his trial counsel should have not have stipulated to Petitioner's prior conviction. (*See* Pet. Memo. at 11). However, the stipulation greatly benefitted Petitioner by keeping facts about his prior conviction from being admitted into evidence. (*See* Lodgment 8 at 19) ("The stipulation that [Petitioner] had received a felony conviction was not highly prejudicial, since the jurors were not told what felony [Petitioner] had been convicted of or any facts of the offense."); *see also Lang v. Callahan,* 788 F.2d 1416, 1418 (9th Cir.1986) ("We find that counsel's strategic decision to stipulate falls well within the range of reasonable professional assistance.").

■ Moreover, even assuming that Petitioner's trial counsel rendered ineffective assistance, Petitioner cannot show prejudice because the evidence of his guilt was overwhelming. *See supra* Part VI.A.; *see also Allen,* 395 F.3d at 992 ("[T]o the extent that any claim of error . . . might be meritorious, we would reject that error as harmless because the evidence of [the petitioner's] guilt is overwhelming."). In sum, the Court concludes that the state courts' denial of this claim was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

#### 5. Ground 1E

■ In Ground 1E, Petitioner contends that his trial counsel should have "object[ed] during trial to evidence that was suppressed." (Petition at 5). Specifically, Petitioner seems to argue that his trial counsel should have objected to the admission of the gun recovered from the crime scene because Judge Webster had ordered that the gun be excluded. (*See* Pet. Memo. at 13–14). Because there is no reasoned state court decision addressing Ground 1E, this Court conducts an independent review of the record. *See Pirtle,* 313 F.3d at 1167.

As set forth above, *see supra* Part VI. B.3.; Petitioner requested that Judge Webster appoint a forensic expert to examine the gun for fingerprints. (*See* 1 RT 167; 1 CT 121). Judge Webster ultimately denied Petitioner's request because there was no need to have a forensic expert analyze the gun. (*See* 1 RT 170); (*see also* 1 RT 168) ("If [the prosecutor] is telling me that no fingerprints on the firearm, nor was the firearm fired in the sense of tying the firearm to a particular bullet[,] . . . I'll deny [the] request[ ] forthwith."). At no time during the hearing, however, did Judge Webster ever exclude the gun from evidence. (*See* 1 RT 156–71). Thus, Petitioner's claim about Judge Webster excluding the gun is belied by the record. *See Dows,* 211 F.3d at 486–87 (holding that factually unfounded claims present no basis for federal habeas relief); *James,* 24 F.3d at 26 ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

■ Having independently reviewed the record, the Court concludes that trial counsel's failure to object to admission of the gun was not deficient. Indeed, the gun was extremely relevant to the charges, despite the lack of fingerprints, because it was recovered from the scene of the crime, (*see* 2 RT 402–03), where Petitioner was

also located, (*see* 2 RT 386–87), and matched Schmidt's description. (*See* 2 RT 355); *see also Monarrez v. Alameda,* 268 Fed.Appx. 651, 653 (9th Cir.2008) ("[T]he gun evidence was probative of [the petitioner's] identity as the shooter."). ___ Thus, any objection to the admission of the gun would have been futile. *See Juan H.,* 408 F.3d at 1273 ("[T]rial counsel cannot have been ineffective for failing to raise a meritless objection."); *Rupe,* 93 F.3d at 1445 ("[T]he failure to take a futile action can never be deficient performance."). Regardless, even assuming that Petitioner's trial counsel should have objected to the admission of the gun, Petitioner cannot show prejudice because the evidence of his guilt was overwhelming. *See supra* Part VI.A.; *see also Allen,* 395 F.3d at 992 ("[T]o the extent that any claim of error . . . might be meritorious, we would reject that error as harmless because the evidence of [the petitioner's] guilt is overwhelming.").

In sum, the Court concludes that the state courts' denial of this claim was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

#### 6. Ground 1F

In Ground 1F, Petitioner contends that his trial counsel should have demonstrated "that alleged witness participated to this alleged robbery." (Petition at 5). Specifically, Petitioner argues that his "conviction was obtained as a result of his appointed defense counsel's knowing use of perjured testimony by the prosecution's witness Audrey Williams." (Pet. Memo. at 15). Petitioner further argues that "Williams

should have been subject as an accomplice for participating in the alleged crime." (*Id.* at 16). Because there is no reasoned state court decision addressing Ground 1E, this Court conducts an independent review of the record. *See Pirtle,* 313 F.3d at 1167.

 It is well—settled that the knowing use of perjured testimony violates a criminal defendant's due process rights. *See Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *accord Jackson v. Brown,* 513 F.3d 1057, 1071 (9th Cir.2008) ("The Supreme Court has long held that a conviction obtained using knowingly perjured testimony violates due process."). Here, however, Petitioner's conclusory allegations about Williams perjuring herself are completely unsupported. (*See* Pet. Memo. at 15–18; *see also Dows,* 211 F.3d at 486–87 (holding that factually unfounded claims present no basis for federal habeas relief).

 Thus, having independently reviewed the record, the Court concludes that trial counsel's failure to show that Williams perjured herself was not deficient. *See Juan H.,* 408 F.3d at 1273 ("[T]rial counsel cannot have been ineffective for failing to raise a meritless objection."); *Rupe,* 93 F.3d at 1445 ("[T]he failure to take a futile action can never be deficient performance."). For the same reason, Petitioner cannot show prejudice. *See Toomey,* 898 F.2d at 744 ("In short, we find the prospects of success of the motion to suppress too remote for counsel's failure to have pressed it to have constituted a Sixth Amendment violation. The connection between a motion to suppress and a reasonable likelihood of a different verdict is even more attenuated."). Moreover, the evidence of Petitioner's guilt was overwhelming, even without Williams's testimony. *See supra* Part VI.A.; *see also Allen,* 395 F.3d at 992 ("[T]o the extent that any claim of error ... might be meritorious,

we would reject that error as harmless because the evidence of [the petitioner's] guilt is overwhelming.").

In sum, the Court concludes that the state courts' denial of this claim was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

### F. Petitioner Is Not Entitled To Habeas Relief On His Claim Regarding Ineffective Assistance Of Appellate Counsel

In Ground 4, Petitioner contends that his appellate counsel rendered ineffective assistance by failing to raise Grounds 1, 2, and 3 on appeal. (*See* Petition at 6). Specifically, Petitioner argues that he "contacted his court—appointed appel[l]ate counsel on multiple occasions" to request that appellate counsel raise the arguments included in Grounds 1, 2, and 3. (Pet. Memo. at 32). There is no merit to this claim.

 Appellate counsel's performance is evaluated under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Evitts v. Lucey,* 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) ("A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."); *accord United States v. Skurdal,* 341 F.3d 921, 926 (9th Cir.2003); *Pollard v. White,* 119 F.3d 1430, 1435 (9th Cir.1997). Nevertheless, the *Strickland* standard applies to claims of ineffective assistance of appellate counsel. *See Smith v. Robbins,* 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) ("[T]he proper

standard for evaluating [the petitioner's] claim that appellate counsel was ineffective ... is that enunciated in [*Strickland* ]."); *accord Turner*, 281 F.3d at 872. A habeas petitioner "must first show that his counsel was objectively unreasonable in failing to find arguable issues to appeal—that is, that counsel unreasonably failed to discover non-frivolous issues and to file a merits brief raising them. If [the petitioner] succeeds in such a showing, he then has the burden of demonstrating prejudice." *Robbins*, 528 U.S. at 285, 120 S.Ct. 746 (citation omitted).

The Ninth Circuit has observed that the *Strickland* prongs often overlap where a petitioner claims incompetent representation by his appellate counsel:

> In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.... Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason—because she declined to raise a weak issue.

*Bailey v. Newland*, 263 F.3d 1022, 1028–29 (9th Cir.2001) (quoting *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir.1989)).

■■■ Because there is no reasoned state court decision addressing Ground 4, this Court conducts an independent review of the record. *See Pirtle*, 313 F.3d at 1167. As an initial matter, Petitioner cannot show that his appellate counsel was ineffective for failing to raise Grounds 1, 2, and 3 because these claims lacks merit, as explained above. *See supra* Parts VI.B., VI.C.1., VI.E.; *see also Turner*, 281 F.3d at 872 ("A failure to raise untenable issues on appeal does not fall below the *Strickland* standard."); *Gustave v. United States*, 627 F.2d 901, 906 (9th Cir.1980) ("There is no requirement that an attorney appeal issues that are clearly untenable. Counsel need not appeal every possible question of law at the risk of being found to be ineffective.").

For the same reason, Petitioner cannot show prejudice. *See, e.g., United States v. Baker*, 256 F.3d 855, 863 (9th Cir.2001) ("[The defendant] cannot satisfy the *Strickland* standard for ineffective assistance because counsel's failure to raise any of these issues neither fell below an objective standard of reasonableness nor prejudiced the defendant. Counsel merely declined to raise several weak issues, none of which presents a reasonable probability that [the defendant] would have prevailed on appeal."); *Jones v. Smith*, 231 F.3d 1227, 1239 n. 8 (9th Cir.2000) ("Because, for the reasons stated above, the discrepancy was not grounds for reversal, Petitioner was not prejudiced by any failure to raise the issue on direct appeal.").

In short, the Court concludes that the state courts' denial of this claim was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

## VII.

## RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that the District Court issue an Order: (1) accepting and adopting this Report and Recommendation, (2) denying the Petition for Writ of Habeas Corpus, and (3) directing that Judgment be

entered dismissing this action with preju-
dice.